*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0058p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROBERT E. BLAU, individually and as parent of AMANDA BLAU, a minor,

*Plaintiff-Appellant,*

*v.*

FORT THOMAS PUBLIC SCHOOL DISTRICT, et al.

*Defendants-Appellees.*

No. 03-6337

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 01-00232—David L. Bunning, District Judge.

Argued: November 30, 2004

Decided and Filed: February 8, 2005

Before: SILER, SUTTON, and FARRIS, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** Robert E. Blau, JOLLY, BLAU, KRIEGE & TURNER, Cold Spring, Kentucky, for Appellant. David J. Kellerman, MIDDLETON REUTLINGER, Louisville, Kentucky, for Appellees. **ON BRIEF:** Robert E. Blau, JOLLY, BLAU, KRIEGE & TURNER, Cold Spring, Kentucky, for Appellant. David J. Kellerman, Mark S. Fenzel, Rebecca Grady Jennings, MIDDLETON REUTLINGER, Louisville, Kentucky, Donald J. Ruberg, O'HARA, RUBERG, TAYLOR, SLOAN & SERGENT, Covington, Kentucky, for Appellees.

---

## OPINION

---

SUTTON, Circuit Judge. In 2001, Highlands Middle School, which is located in Fort Thomas, Kentucky, adopted a dress code for its students. On behalf of his daughter, Amanda Blau, then in the sixth grade at Highlands Middle School, and himself, Robert Blau challenged the constitutionality of the regulation, claiming that it violates (1) Amanda's First Amendment right to freedom of expression, (2) her substantive-due-process right to wear the clothes of her choosing and (3) Robert's substantive-due-process right to control the dress of his child. The district court found no constitutional violation and neither do we.

---

[*] The Honorable Jerome Farris, Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

I.

Highlands Middle School includes students in the sixth, seventh and eighth grades and is part of the Fort Thomas Public School District. Under Kentucky law, each school district has a governing school board and each school has a Site Based Decision Making Council consisting of two parents, three teachers and the school's principal. The Council has responsibility for setting school policy that is consistent with the school board's policies and that is designed to "provide an environment to enhance the students' achievement and help the school meet [its] goals." Ky. Rev. Stat. § 160.345(2)(c)(1).

On May 15, 2001, at a meeting of the Highlands Council, several parents proposed a dress code for the school to "create unity, strengthen school spirit and pride, and focus[] attention upon learning and away from distractions." JA 621. The proposal relied on other school districts' findings that dress codes had "enhanced school safety, improved the learning environment, promoted good behavior, reduced discipline problems, improved test scores, improved children's self-respect and self-esteem, bridged socio-economic differences between families, helped eliminate stereotypes and produced a cost savings for families." *Id.*

On May 22, 2001, Highlands principal Mary Adams sent a letter to all Highlands students and their parents about the dress code proposal and set up a meeting to discuss it. Several Highlands students and their parents attended the meeting, including Amanda and Robert Blau. After the meeting, the Council formed a committee consisting of two council members, two teachers, four parents and four students (including Amanda Blau) to make a recommendation about the proposal. The dress code committee gathered feedback from teachers, parents and students, made modifications to the proposal and eventually proposed a dress code for the middle school, which the Council adopted on August 21, 2001.

Among other prohibitions, the dress code restricts the following:

* clothing that is too tight, revealing or baggy as well as tops and bottoms that do not "overlap";

* "[h]ats, caps, scarves, or sweatbands" except on "special event days" such as "spirit" or "reward" days;

* non-jewelry chains and chain wallets;

* clothing that is "distressed" or has "holes in it";

* "[v]isible body piercing (other than ears)";

* "[u]nnaturally colored hair that is distracting to the educational process," including "blue, green, red, purple, [or] orange" hair;

* "clothing that is too long, flip-flop sandals, or high platform shoes";

* pants, shorts or skirts that are not of "a solid color of navy blue, black, any shade of khaki, or white";

* "[s]horts, skirts, or skorts" that do not "reach mid-thigh or longer";

* "[b]ottoms made with stretch knits, flannel, or fleece such as sweatpants, jogging pants, or any type of athletic clothing" as well as "[b]aggy, sagging, or form-fitting pants";

* tops that are not "a solid color" and are not "crew neck [style], polo style with buttons, oxford style, or turtleneck";

* tops with writing on them and "[l]ogos larger than the size of a 'quarter' . . . except 'Highlands' logos or other 'Highlands Spirit Wear'";

* tops that are not "of an appropriate size and fit"; and

* "form-fitting or baggy shirts" or "[a]ny material that is sheer or lightweight enough to be seen through."

JA 697–98.  The dress code is reprinted in full at Appendix A.

According to the policy,

> The objective of this dress code is to provide an appropriate educational environment while allowing students to dress comfortably within limits to facilitate learning.  Students' attire can have a positive or negative effect on the learning process, contribute to students' success, and generate a safe and positive learning environment.  We expect students to maintain the type of appearance that is not distracting to students, teachers, or the educational process of the school.  Parents and children are equally responsible for the appearance of the child.  There is appropriate and inappropriate attire for all of life's activities.  Keeping these ideas in mind, please help your student adhere to these guidelines.

JA 697.

On November 21, 2001, Robert Blau, a lawyer, filed this action against the Fort Thomas Public School District on his and Amanda's behalf in federal court.  The lawsuit sought injunctive and monetary relief and invoked 42 U.S.C. § 1983, the First and Fourteenth Amendments of the United States Constitution and certain sections of the Kentucky Constitution as grounds for relief.  The lawsuit sought to invalidate the dress code on its face (which is to say, in essentially all of its applications) and as applied (which is to say, in its application to Amanda and Robert Blau).  The Blaus did not claim that the dress code was incompatible with any religious beliefs that they may hold.  In addressing whether there was "any particular message" that she wished to convey through her clothing, Amanda stated that there was not. JA 708.  She opposes the dress code because she wants to be able to wear clothes that "look[] nice on [her]," that she "feel[s] good in" and that express her individuality. JA 707.  Robert Blau likewise has not pointed to any particular message that the dress code prohibits Amanda from conveying, instead complaining that the dress code inhibits her "ability to wear clothing that she likes." JA 732.

Before the 2002 school year had begun and while this lawsuit was pending, the Highlands Council modified the dress code.  The amendment loosened the dress code in some respects (pants, shorts or skirts may be any solid color, and striped and patterned tops are permitted) and tightened it in others (blue jeans are prohibited, "[c]lothing that promotes drugs, alcohol, tobacco, sex, or is offensive or degrading" is prohibited and tops with "[l]ow, scoop, plunging or revealing necklines" are prohibited). JA 699–700.  Otherwise, as readers can see for themselves, the new dress code is essentially the same as the old dress code.  *See* Appendix B.

In granting the school district's motion for summary judgment, the district court rejected each of the Blaus' claims with respect to the first version of the dress code and the Blaus' one claim with respect to the second version of the dress code—the ban on blue jeans.  It held that the dress codes did not violate Amanda's First Amendment right to freedom of speech, that there is no fundamental right under the Fourteenth Amendment to wear the clothes of one's choosing to public school and that a parent's fundamental right under the Fourteenth Amendment to control the education of his or her child does not bar a school district from adopting a reasonable dress code.  The district court also determined that the Blaus were afforded procedural due process, that the Council did not exceed its statutory authority in enacting the code and that the Council's actions did not violate the Kentucky Open Meetings Act.  The Blaus appeal the

district court's decision, which we review de novo. *Black v. Roadway Express, Inc.*, 297 F.3d 445, 448 (6th Cir. 2002).

## II.

Before turning to the merits, we first address the school district's argument that we no longer have Article III jurisdiction over this dispute. The school district is right that we must consider this argument before reaching the merits but wrong in asserting that our authority over this dispute has vanished. Fort Thomas argues that this challenge to the dress code became moot when Amanda Blau entered high school and freed herself from the restrictions of the Highlands Middle School dress code. But in bringing this claim, Robert Blau not only sought injunctive and declaratory relief but also sought damages as well. Thus, even if Amanda's matriculation from middle school to high school mooted the claim for injunctive and declaratory relief (a point we need not decide), the existence of a damages claim ensures that this dispute is a live one and one over which Article III gives us continuing authority. *See Boag v. MacDougall*, 454 U.S. 364, 364 (1982) (transfer to another prison did not moot prisoner's damages claim arising from his allegedly being placed in solitary confinement without notice or hearing); *Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004) (injunctive relief could no longer redress the injury and the "capable of repetition, yet evading review" doctrine did not apply, but plaintiff's nominal damages claim saved action from mootness); *Mellen v. Bunting*, 327 F.3d 355, 364–65 (4th Cir. 2003), *cert. denied*, 124 S. Ct. 1750 (2004) (plaintiffs' claim for injunctive relief arising from challenge to constitutionality of supper prayer at Virginia Military Institute became moot upon the plaintiffs' graduation but the damages claim continued to present a live controversy); *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 218 (3d Cir. 2003) (while a student's First Amendment claims for injunctive and declaratory relief became moot upon her graduation, her damages claim continued to present a live controversy); *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (en banc) ("A student's graduation moots claims for declaratory and injunctive relief, but it does not moot claims for monetary damages.").

In a slight variation on this theme, the school district argues that the Blaus' challenge to the 2001 dress code became moot when the school district made modest alterations to the dress code before the 2002 school year. But, again, because the Blaus sought damages in their challenge to the 2001 dress code, the modification of the dress code before the 2002 school year does not moot this challenge to the earlier dress code. It is true that the Blaus' summary judgment papers and appellate papers complain not only about the 2001 dress code but also about one component of the 2002 dress code—the ban on blue jeans. It is true that the Blaus never amended their complaint to cover the 2002 dress code and its ban on blue jeans. And it is true that the district court addressed the ban on blue jeans in its opinion. But all of this does not create a jurisdictional effect; it merely establishes that the school district waived its right to challenge the Blaus' authority to complain about a component of the 2002 dress code when they had not amended their complaint to do so. While a party's conduct may not alter the subject matter jurisdiction of the federal courts, *see Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567 (2004), the inclusion of the ban on blue jeans in this litigation does not go to jurisdiction; it goes to what challenges and defenses the parties have opted to bring to the court in the first instance.

## III.

In turning to the merits of the First Amendment challenge, the difficult question here is not one of outcome. If, as *Boroff v. Van Wert City Board of Education*, 220 F.3d 465 (6th Cir. 2000), holds, a school district court may enforce a dress code that bans "offensive illustrations," *id.* at 467, and if it may bar a student from wearing nihilistic Marilyn Manson T-shirts under that regulation, it surely follows that a school district may enforce a dress code that regulates the types of pants and tops students may wear and may do so with respect to a student who does not wish to convey "any particular message" through her clothing but simply wants to wear clothes that "look nice" on her. The difficult question under these circumstances is not whether Amanda Blau's claim can succeed; it cannot. It is whether the First Amendment covers this kind of claim at all.

The protections of the First Amendment do not generally apply to conduct in and of itself. To bring a free-speech claim regarding actions rather than words, claimants must show that their conduct "convey[s] a particularized message" and "the likelihood [is] great that the message [will] be understood by those who view[] it." *Spence v. Washington*, 418 U.S. 405, 411 (1974); *Texas v. Johnson*, 491 U.S. 397, 404 (1989). The threshold is not a difficult one, as "a narrow, succinctly articulable message is not a condition of constitutional protection." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995). Otherwise, the First Amendment "would never reach the unquestionably shielded painting of Jackson Pollack, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Id.*

But the Supreme Court's expressive-conduct cases, whether in the school setting or not, offer poor analogies to Amanda Blau's claim. In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 514 (1969), the Court held that the school district could not prevent students from wearing arm bands to protest the Vietnam War. In *United States v. O'Brien*, 391 U.S. 367, 382 (1968), the Court held that the act of burning a draft card to protest the Vietnam War implicated the First Amendment but could nonetheless be proscribed because the government had a substantial interest in the regulation unrelated to the suppression of expression. In *Spence*, the Court held that a public school could not prevent a college student from hanging a flag with a peace sign upside down in his dormitory room window to express disappointment with the Cambodian incursion and the Kent State tragedy. 418 U.S. at 415. In *Johnson*, the Court held that the First Amendment prevented the State from punishing the burning of the American flag to protest the renomination of Ronald Reagan. 491 U.S. at 399. And, similarly, the Court has held that the First Amendment reaches the act of saluting (or refusing to salute) the flag, *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943), the act of displaying a red flag in support of the Communist Party, *Stromberg v. California*, 283 U.S. 359, 369 (1931), and "marching, walking or parading" in uniforms displaying the swastika, *Nat'l Socialist Party of Am. v. Skokie*, 432 U.S. 43, 43 (1977).

To say that Amanda Blau's desire to wear clothes she "feel[s] good in," as opposed to her desire to express "any particular message," JA 708, fits within this line of cases gives the invocation of precedent a bad name. In one of these cases, in point of fact, the Court expressly contrasted the right to wear a black arm band, a "direct, primary First Amendment right[] akin to 'pure speech,'" with the permissible "regulation of the length of skirts or the type of clothing, to hair style, or deportment." *Tinker*, 393 U.S. at 507–08. Not even "being in a state of nudity," a world away from a middle school dress code and what amounts to the ultimate challenge to any dress code, is inherently expressive conduct, the Supreme Court has noted. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000). And nude dancing itself is barely "within the outer ambit of the First Amendment's protection." *Id.*

Under these circumstances, the Blaus have not met their burden of showing that the First Amendment protects Amanda's conduct—which in this instance amounts to nothing more than a generalized and vague desire to express her middle-school individuality. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) (the burden is on the "person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies"). As Amanda stated in her deposition, she does not wish to convey any particular message, but wishes only to wear clothes that she thinks "look[] nice on [her]" and that "she feel[s] good in." JA 707. And Robert Blau has not pointed to any particularized message that Amanda wishes to convey. In his deposition, he stated only that the dress code hinders "[h]er own ability to wear clothing that she likes" but did not suggest what message the clothing she likes would convey. It is not lost on us that, in the eyes of a 12-year old, "look[ing] nice" and "feel[ing] good" about the clothing one wears are important and, rightly or wrongly, may be enough to make or break a kid's day. Style and taste in clothing, it also is true, may be one of the first ways in which children learn to express their individuality and engage in self-expression. And, as every parent knows (or will soon learn), it is often through choices in clothing that children first learn how to challenge authority, though usually authority in the form of their parents, not their school (which perhaps is the reason why parents urge schools to adopt dress codes in the first place).

Even so, the First Amendment does not protect such vague and attenuated notions of expression—namely, self-expression through any and all clothing that a 12-year old may wish to wear on a given day. To meet the modest requirements for bringing an expressive-conduct claim within the umbrella of protection provided by the First Amendment, the claimant at a minimum must show that the desired conduct (*e.g.*, the desired clothing) can fairly be described as "imbued with elements of communication," *Johnson*, 491 U.S. at 406, which "convey[s] a particularized message" that will "be understood by those who view[] it," *Spence*, 418 U.S. at 411. The Blaus have not made that showing. *See Zalewska v. County of Sullivan*, 316 F.3d 314, 320 (2d Cir. 2003) (First Amendment did not extend to female bus driver's act of wearing a skirt because "a person's choice of dress or appearance in an ordinary context does not possess the communicative elements necessary to be considered speech-like conduct entitled to First Amendment protection."); *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1307 n.4 (8th Cir. 1997) (student's tattoo was "nothing more than self-expression" and as such was not imbued with First Amendment protections). To rule otherwise not only would erase the requirement that expressive conduct have an identifiable message but also would risk depreciating the First Amendment in cases in which a "particularized message" does exist.

While this analysis explains why the Blaus may not bring a First Amendment challenge on their own behalf, it does not end the matter. In the context of First Amendment challenges, unlike most areas of constitutional litigation, a claimant may seek protection not only on her own behalf but on behalf of others as well. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Litigants [ ] are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."); *Bd. of Trs. of the State Univ. of New York v. Fox*, 492 U.S. 469, 482–83 (1989) (A "person invoking overbreadth may challenge a statute that infringes protected speech even if the statute constitutionally might be applied to him.") (quotation marks omitted). *See also Broadrick*, 413 U.S. at 612–13 ("Facial overbreadth claims have also been entertained where statutes, by their terms, purport to regulate the time, place, and manner of expressive or communicative conduct."); *Fox*, 492 U.S. at 482–84 (discussing difference between facial and as-applied challenges). But "a law's application to protected speech [must] be substantial, not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the strong medicine of overbreadth invalidation." *Virginia v. Hicks*, 539 U.S. 113, 120 (2003) (citation and quotation marks omitted). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

The overbreadth doctrine, then, permits litigants like Robert Blau (and Amanda) to invoke the rights of others and to invalidate the dress code so long as they can show that it suppresses a "substantial" amount of protected conduct engaged in by others. The ability to raise this kind of challenge, however, is one thing; the ability to win it is another.

Under the traditional test for assessing restrictions on expressive conduct, a regulation will be upheld if (1) it is unrelated to the suppression of expression, (2) it "furthers an important or substantial government interest," *O'Brien*, 391 U.S. at 377, and (3) it "does not burden substantially more speech than necessary to further [the] interest[]." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997). The Blaus cannot satisfy this test, much less show that the dress code suppresses a "substantial" amount of protected conduct.

First, the 2001 dress code exists in spite of, not because of, its impact on speech or expressive conduct. The dress code's stated purpose is to "create unity, strengthen school spirit and pride, and focus[] attention upon learning and away from distractions," JA 621, which is consistent with the Council's statutory mandate to implement policies that "provide an environment to enhance the students' achievement and help the school meet [its] goals." Ky. Rev. Stat. § 160.345(2)(c)(1). And in promulgating the dress code based on the experiences of other school districts with similar regulations, school officials thought that the regulation would "enhance[] school safety, improve[] the learning environment, promote[] good

behavior, reduce[] discipline problems, improve[] test scores, improve[] children's self-respect and self-esteem, bridge[] socio-economic differences between families, help[] eliminate stereotypes and produce[] a cost savings for families." JA 621. Consistent with these First-Amendment-benign objectives, the dress code does not regulate any particular viewpoint but merely regulates the types of clothes that students may wear. (The Blaus do not complain about the one seemingly content-based component of the 2001 dress code—its prohibition of any logos larger than the size of a quarter save for Highlands logos or other "Highlands Spirit Wear.")

In response, the Blaus claim that all of this is pretext, that the real purpose of the code is to suppress student expression. But the only evidence the Blaus offer to bolster this contention is the statement of Highlands principal Mary Adams, who said that even though Highlands is a high-achieving school in terms of student accomplishment, it does not "mean we can't do something else to let the students know what we feel is appropriate." JA 346. Merely because a dress code conveys what a school district believes is "appropriate" does not mean that the regulation exists in order to suppress speech or turns on the expressive quality of the clothing at issue. Again, the regulation is viewpoint and essentially content neutral. The only way in which a regulation of "appropriate" middle-school clothing can fairly be described as speech suppressive is if everything sartorial is speech expressive. That is not true.

Second, the dress code furthers important governmental interests. They include: bridging socio-economic gaps between families within the school district, focusing attention on learning, increasing school unity and pride, enhancing school safety, promoting good behavior, reducing discipline problems, improving test scores, improving children's self-respect and self-esteem, helping to eliminate stereotypes and producing a cost savings for families. These are all important governmental interests, and the Blaus do not contend otherwise.

Nonetheless, the Blaus counter, the problems that the dress code seeks to address are not present at Highlands because it is already a high-achieving school with some of the top test scores in the State and the school has few discipline problems, episodes of clothing-based fights or safety concerns. This response has at least two flaws. For one, it addresses just some of the school district's interests while neglecting to mention the others. It says nothing at all, for example, about bridging socio-economic differences within a school district—which would always seem to be a sensible reason for a dress code and would invariably satisfy this modest requirement. For another, when a school district attains certain levels of achievement, it hardly means that it no longer has an interest in improving the educational environment further. In a world in which most people and institutions are either moving forward or backward, a school district cannot be faulted for searching for new ways to be excellent.

The school district, moreover, presented affidavits from three teachers who agreed that the dress code has had a positive impact on the Highlands learning environment. Marie Shields stated that the dress code has made it easier for teachers to "keep the focus of the students on instruction rather than on what other students are wearing," has reduced peer pressure on students to "dress right," and has led to fewer "disruptions and distractions from students wearing revealing, distracting, and inappropriate clothing." JA 655. Christy Petroze stated that "students are more focused on learning in class and not on what other students are wearing," that she has been able to be more focused on teaching "because [she has] not been distracted by students wearing inappropriate or revealing clothing," and that students "seem to take school more seriously" and are "free from the concept of one-upmanship . . . that existed prior to the enactment of the [dress code]." JA 658. Edith Mariani noted that the dress code has "increased school spirit and pride" and has "increased the students' respect for themselves and their respect for others." JA 661.

Nor, under the final *O'Brien* inquiry, does the dress code suppress substantially more expressive conduct than is necessary to further its interests. *See* 391 U.S. at 377. As an initial matter, the Blaus have offered few examples of ways in which the dress code affects cognizable expressive conduct—except, as noted at oral argument, that the code limits the ability of students to wear t-shirts expressing their interests in music, the arts or politics. Beyond this, however, the dress code applies only to middle-school students

during school hours; they remain free to dress as they (and their parents) wish in the evenings and on the weekends.  And to the extent the dress code curbs expressive activity during the school day, the students have other outlets of expression during school hours:  They may write for the school newspaper (which Amanda to her credit has done); they may express themselves by joining other extra-curricular activities; they may express themselves through school assignments; they may associate with whomever they (and their parents) please; and they may still wear buttons expressing other viewpoints, as permitted by the dress code.  In the end, the school district has satisfied all three prongs of the *O'Brien* test, which necessarily establishes that the Blaus have not met their burden of showing that they are entitled to "the strong medicine of overbreadth invalidation." *Virginia v. Hicks*, 539 U.S. at 120 (quotation marks omitted).

    One other observation is vital to this analysis.  *O'Brien* dealt with the burning of draft cards during the Vietnam War and accordingly was not a case involving the public schools, much less a case involving a middle school.  "While children [ ] do not 'shed their constitutional rights . . . at the schoolhouse gate,' the nature of those rights is what is appropriate for children in school." *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 656 (1995) (quoting *Tinker*, 393 U.S. at 506).  It long has been the case that constitutional claims generally receive less rigorous review in the secondary and middle school setting than they do in other settings. *Tinker*, 393 U.S. at 507 ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.").  In the First Amendment arena and other arenas as well, the Supreme Court thus has frequently emphasized that public schools have considerable latitude in fashioning rules that further their educational mission and in developing a reasonable fit between the ends and means of their policies. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (recognizing that "the determination of what manner of speech in the classroom . . . is inappropriate properly rests with the school board rather than with the federal courts") (citation omitted); *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985) (public school educational environment requires "close supervision of schoolchildren" and "enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult"); *Vernonia Sch. Dist.*, 515 U.S. at 655 (school authorities act "with the power and indeed the duty to inculcate the habits and manners of civility") (quotation marks omitted); *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 441 (5th Cir. 2001) ("Educators have an essential role in regulating school affairs and establishing appropriate standards of conduct."); *Long v. Bd. of Educ. of Jefferson County, Ky.*, 121 F. Supp. 2d 621, 626 (W.D. Ky. 2000), *aff'd on the basis of the district court opinion by Long v. Bd. of Educ. of Jefferson County, Ky.*, No. 00-6710, 2001 U.S. App. LEXIS 18103 at *2 (6th Cir. Aug. 7, 2001) ("The unique characteristics of the school environment [ ] allow school officials greater leeway to regulate expression in schools.").  All of these things considered, the Blaus' First Amendment claim fails as a matter of law.

IV.

    The Blaus next argue that the dress code's prohibition on blue jeans violates Amanda's substantive due process rights under the Fourteenth Amendment.  We disagree.

    The first (and often last) issue in this area is the proper characterization of the individual's asserted right. *Reno v. Flores*, 507 U.S. 292, 302 (1993).  Governmental actions that infringe a fundamental right receive strict scrutiny. *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000).  Otherwise, they receive rational-basis review, which requires them only to be "rationally related to a legitimate state interest." *Id*. at 575.

    Amanda faces an uphill battle in claiming that strict scrutiny applies.  The list of fundamental rights "is short," *id*., it does not include the wearing of dungarees and "the Supreme Court has expressed very little interest in expanding" the list, *id.*  Nor do the fundamental rights that the Court *has* recognized offer a flattering analogy to Amanda's claim.  Whether it be the right to marry, the right to have children, the right to direct the educational upbringing of one's child, the right to marital privacy, the right to use contraception, the right to bodily integrity or the right to abortion, *see Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), none of these fundamental rights has much, if anything, in common with the right to wear

blue jeans. And the Court has expressly counseled lower courts to be "reluctant to expand the concept of substantive due process because guideposts for decision making in this unchartered area are scarce and open-ended." *Id.* "By extending constitutional protection to an asserted right or liberty interest [the court], to a great extent place[s] the matter outside the arena of public opinion and legislative action," *id.*, and as such "the doctrine of judicial self-restraint requires [a court] to exercise the utmost care whenever [ ] asked to break new ground in this field." *Flores*, 507 U.S. at 302. If bans on blue jeans today lie beyond the field of democratically enacted laws, in other words, what next? And by what measure of inclusion or exclusion? The Blaus have offered no explanation why "the arena of public opinion and legislative action," or its equivalent (a school board), is ill-equipped to handle the question whether blue jeans ought to be worn in public schools.

Neither does the test for identifying a new fundamental right—those rights that are "deeply rooted in this Nation's history and tradition," *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977), or so "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed," *Glucksberg*, 521 U.S. at 721 (quotation marks omitted)—advance Amanda's cause. While it may be true that blue jeans have been worn since before the Fourteenth Amendment, *see* Invention of Levi's 501 Jeans, http://www.levistrauss.com/about/history/jeans.htm, that is due to the entrepreneurial ingenuity and taste of Levi Strauss and his progeny, not any history of public laws requiring schools (or any other institution) to allow blue jeans to be worn at given times or in given places. Moreover, in an analogous area—school restrictions on hair length—we have rejected the argument that a high school student's desire to groom his hair however he wishes is a fundamental right. *See Gfell v. Rickelman*, 441 F.2d 444, 446 (6th Cir. 1971) (upholding school restrictions on hair length in a public school); *see also Byars v. City of Waterbury*, 795 A.2d 630, 642–43 (Conn. Super. Ct. 2001); *cf. Kelley v. Johnson*, 425 U.S. 238, 239 (1976) (state's regulation of hair length of police officers did not violate Fourteenth Amendment).

Despite all of this, the Blaus have identified one case, *Bannister v. Paradis*, 316 F. Supp. 185 (D.N.H. 1970), that appears at first blush to support their position. *Bannister* invalidated a public middle school's prohibition on the wearing of dungarees. *Id.* at 189. And, in its brief analysis reaching this conclusion, the district court relied heavily on the following language from *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251 (1891), which the Blaus urge us to follow here:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Bannister*, 316 F. Supp. at 188 (quoting *Union Pac. Ry.*, 141 U.S. at 251). But in reading this admittedly sweeping language to justify a constitutional right to wear blue jeans, the district court overlooked the limited context in which it was written. At stake in the *Union Pacific Railway* tort lawsuit was a request by the defendant to obtain a court order requiring the plaintiff, who had suffered brain and spinal cord damage when a berth in a rail car fell on her, to submit to a surgical examination regarding the cause and extent of her injuries. The court *rejected* the railroad's substantive due process argument, which by itself makes the case a poor candidate for *extending* fundamental rights to another claim. And the rest of the Court's analysis, which is quite consistent with later Supreme Court precedents, illustrates the perils of failing to anchor broad language to the context in which it was written:

> To compel [someone] to lay bare the body, or to submit to the touch of a stranger, without lawful authority, is an indignity, an assault, and a trespass; and no order of process, commanding such an exposure or submission, was ever known to the common law in the administration of justice between individuals.

*Union Pac. Ry.*, 141 U.S. at 252. *See also Rochin v. California*, 342 U.S. 165, 172 (1952) (conviction could not be sustained when the government's evidence was obtained by forcibly pumping the defendant's

stomach for illegal drug capsules). Quite plainly, forcing someone to "lay bare the body" to a surgical procedure is not the same thing as forcing a middle-school student to wear certain types of clothes to school. In the final analysis, the Blaus have not established that their claim warrants strict scrutiny and, for reasons noted earlier, they cannot tenably claim that the dress code lacks a rational basis.

V.

Robert Blau next argues that the dress code interferes with his fundamental right to direct the education of his child. We again disagree.

For some time and for considerably longer than most individual constitutional rights have existed, the Supreme Court has recognized a "fundamental right of parents to make decisions concerning the care, custody and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *see Meyer v. Nebraska*, 262 U.S. 390 (1923) (statute prohibiting the teaching of subjects in any school, public or private, in any language other than English was an arbitrary interference with parents' right to control the education of child); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925) (statute requiring all children between the ages of 8 and 16 years of age to attend public school "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control"). And while this right plainly extends to the public school setting, it is not an unqualified right. *See Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (no parental right to educate children in private segregated schools).

The critical point is this: While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or, as here, a dress code, these issues of public education are generally "committed to the control of state and local authorities." *Goss v. Lopez*, 419 U.S. 565, 578 (1975); *see Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 291 (5th Cir. 2001) ("While [p]arents may have a fundamental right in the upbringing and education of their children, this right does not cover the [p]arent's objection to a public school Uniform Policy."); *see also Leebaert v. Harrington*, 332 F.3d 134, 142 (2d Cir. 2003) (The fundamental right to control the upbringing and education of one's child does not include "the right to tell public schools what to teach or what not to teach him or her."); *Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 699 (10th Cir. 1998) (parents do not have a fundamental right to send their child to school part-time only and pick and choose the classes she takes); *Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174, 176 (4th Cir. 1996) (requirement that high school students perform community service in order to graduate does not violate parents' right to control education of their children); *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 462 (2d Cir. 1996) (applying rational-basis review to determine that high school could require community service before graduation); *Brown v. Hot, Sexy and Safer Prods., Inc.*, 68 F.3d 525, 533 (1st Cir. 1995) (parents' fundamental right to control a child's education does not include the right to control curriculum at their child's public school); *Kite v. Marshall*, 661 F.2d 1027, 1029 (5th Cir. 1981) (parents have no fundamental right to send their children to summer athletic camp against school regulation prohibiting such camps).

As these cases and the reasoning behind them make clear, Robert Blau does not have a fundamental right to exempt his child from the school dress code. And he has fallen far short of showing that the dress code fails to satisfy rational-basis review.

VI.

The Blaus also appear to make a procedural due process argument, claiming that they did not have notice or an opportunity to respond to the proposed dress code. Due process, it is true, requires that individuals "be given an opportunity for a hearing before [being] deprived of any significant property interest." *Purisch v. Tennessee Tech. Univ.*, 76 F.3d 1414, 1423 (6th Cir. 1996). But like all other parents,

Robert Blau had ample knowledge of the school district's dress code proposal and its intent to discuss the proposal at its June 5, 2000, meeting, as proved by the following facts: he took an active role in the June 5, 2000, meeting; he was present at the June 26 meeting to discuss the dress code; he developed his own dress code proposal which was considered by the Council at its August 21, 2001, meeting; and Amanda Blau served on the dress code committee that initially approved the dress code and recommended it to the council for adoption. No due process violation occurred on this record.

## VII.

The Blaus next argue that the dress code violates their right to be free from arbitrary and capricious state action under Section 2 of the Kentucky State Constitution. But a statute satisfies this modest constitutional requirement "if a reasonable, legitimate public purpose for it exists whether or not we agree with its wisdom or expediency." *Buford v. Kentucky*, 942 S.W.2d 909, 911 (Ky. Ct. App. 1997). The school district has met that test.

Nor do the Blaus strengthen their hand by arguing that the Council exceeded its statutory authority in this instance. The relevant statute tasks the Council with setting school policy that "provide[s] an environment to enhance the students' achievement and help[s] the school meet [its] goals." Ky. Rev. Stat. § 160.345(2)(c)(1). A dress code assuredly falls well within this broad authority. Neither is it the case that any dress code must be implemented as part of a school-wide safety plan under Ky. Rev. Stat. § 160.345(2)(i)(7). Section 160.345(2)(i) sets forth "additional areas" in which the Council shall enact policies; it does not require that *any* policy enacted must be in accordance with those additional areas. Ky. Rev. Stat. § 160.345(2)(i)(7).

## VIII.

The Blaus, lastly, contend that the adoption of the dress code violated the Kentucky Open Meetings Act. Ky. Rev. Stat. § 61.835. They argue that all school Council actions must be recorded in the minutes, the August 21, 2001, minutes do not show that the Council preserved the motion to read the dress code a second time before passage, and consequently the motion was never "legally passe[d]." Blau Br. at 59. Not exactly. The minutes show that the dress code was read aloud, and they list the changes made to the code by the Council prior to enactment. They also state that "[a]fter a lengthy discussion the Council reached the consensus to adopt the Dress Code." JA 581. The Kentucky Open Meetings Act requires only that the "minutes of action taken at every meeting" of any public agency set "forth an accurate record of votes and actions at such meetings," and that they be recorded and open to public inspection. Ky. Rev. Stat. § 61.835. The Council minutes state that a second reading was conducted and record the action taken, which is all that the Act requires. *See* Ky. Rev. Stat. § 61.835.

The Blaus further contend that because the Council adopted the dress code by "consensus" and formally did not vote on the dress code and record its votes, no official action was taken and the dress code was never actually passed. But Kentucky law defines "action taken" as a "collective decision, a commitment or promise to make a positive or negative decision, or an actual vote by a majority of the members of the governmental body." Ky. Rev. Stat. § 61.805(3). An "action taken" thus may either be an actual vote or a "collective decision," *id*., and accordingly the "consensus" reached by the Council and recorded in its minutes, JA 581, fits well within this definition.

IX.

For these reasons, we affirm the judgment of the district court.

Appendix A

**HIGHLANDS MIDDLE SCHOOL
UNIFIED DRESS CODE POLICY**

Highlands Middle School will be implementing a school-wide "Unified Dress Code" for the 2001 –2002 school year. The Site Based Decision Making Council at Highlands Middle School adopted this policy, and all students are expected to comply with the dress code. Unified dress clothing is expected each school day except designated "Spirit" or "Reward" days, including the first day (September 4, 2001). The objective of this dress code is to provide an appropriate educational environment while allowing students to dress comfortably within limits to facilitate learning. Students' attire can have a positive or negative effect on the learning process, contribute to students' success, and generate a safe and positive learning environment. We expect students to maintain the type of appearance that is not distracting to students, teachers, or the educational process of the school. Parents and children are equally responsible for the appearance of the child. There is appropriate and inappropriate attire for all of life's activities. Keeping these ideas in mind, please help your student adhere to these guidelines.

**The specific Unified Dress Code requirements are as follows:**

*GENERAL GUIDELINES*
- All clothing must be of appropriate size and fit neatly.
- Oversize clothing, saggy or baggy pants, low necklines and midriff shirts as well as "Overall" style clothing will not be permitted.
- Tops and bottoms must overlap at all times, including when arms are raised.
- Hats, caps, scarves, or sweatbands will be permitted on special event days only.
- Chains (non-jewelry) or chain wallets are not to be worn in school.
- Clothing that is distressed or that has holes in it is not to be worn in school.
- Visible body piercing (other than ears) is not permitted at school.
- Unnaturally colored hair that is distracting to the educational process is not permitted. Examples of unnatural hair colors could include, but are not limited to, blue, green, red, purple, orange, etc.
- Articles of apparel, clothing, or accessories that present a hazard to the individual or to other people will not be permitted.
- Due to safety concerns, clothing that is too long, flip-flop sandals, or high platform shoes will not be permitted.

*PANTS, SHORTS, CAPRIS, SKIRTS, SKORTS*
- Must be a solid color of navy blue, black, any shade of khaki, or white.
- Shorts, skirts, or skorts must reach mid-thigh or longer.
- Bottoms made with stretch knits, flannel, or fleece such as sweatpants, jogging pants, or any type of athletic clothing are not permitted.
- Baggy, saggy, or form-fitting pants are not permitted.

*TOPS*
- Must be a solid color.
- Styles include: crew neck, polo style with buttons, oxford style, or turtleneck.
- Shirts must have sleeves.
- No writing is allowed on the top. Logos larger than the size of a "quarter" are not permitted, except "Highlands" logos or other "Highlands Spirit Wear."
- All tops should be of an appropriate size and fit; no form-fitting or baggy shirts will be permitted.
- Any material that is sheer or lightweight enough to be seen through will not be permitted.

### *VESTS*
• Vests must meet all color and fit guidelines.

### *COLD WEATHER WEAR*
• Cardigan (button or zip) and crew neck sweaters are permitted but must follow all color and fit guidelines.
• Sweatshirts and pullovers must be a solid color with no writing or logos unless they are "Highlands" sweatshirts or pullovers.
• Shirts that meet all previous guidelines must be worn under sweaters, sweatshirts, and pullovers at all times.

### *DRESSES AND JUMPERS*
• Must be a solid color and meet all previous guidelines regarding fit and length.
• All dresses must also meet the requirements listed under *TOPS* above regarding sleeves.

*Appendix B*

**HIGHLANDS MIDDLE SCHOOL
DRESS CODE POLICY**

Students at Highlands Middle School are expected to adhere to the following dress code policy. The objective of this dress code is to provide an appropriate educational environment while allowing students to dress comfortably within limits to facilitate learning. We expect students to maintain the type of appearance that is not distracting to students, teachers, or the educational process of the school. Parents and children are equally responsible for the appearance of their child. There is appropriate and inappropriate attire for all of life's activities. Keeping these ideas in mind, please help your student adhere to these guidelines.

**The specific Dress Code requirements are as follows:**

*GENERAL GUIDELINES*

*These guidelines are to be followed on all school days, including "Out of Dress Code Days" and "Spirit Days"*

- All clothing must be of appropriate size, and fit neatly.
- Oversize clothing, saggy or baggy pants, low necklines and midriff shirts will not be permitted.
- Tops and bottoms must overlap at all times, including when arms are raised.
- Students may wear hats, caps, scarves, or sweatbands in school on announced special event days only.
- Chains (non-jewelry) or chain wallets are not to be worn in school.
- Clothing that is distressed or that has rips or holes in it is not to be worn in school.
- Visible body piercing other than ears is not to be worn at school or school activities.
- Unnaturally colored hair that is distracting to the education process is not permitted. Examples of unnatural hair colors could include, but are not limited to, blue, green, red, purple, orange, etc.
- Articles of apparel, clothing, or accessories that present a hazard to the individual or to other people will not be permitted.
- Due to safety concerns, we will not allow clothing that is too long, flip-flop sandals, or high platform shoes.
- Clothing that promotes drugs, alcohol, tobacco, sex, or is offensive or degrading is not to be worn in school.

*PANTS, SHORTS, CAPRIS, SKORTS*

- Must be a solid color.
- No blue jeans will be permitted.
- Shorts[] or skorts must be mid-thigh length or longer.
- Pants made of stretch knits, flannel, fleece, such as sweatpants, jogging pants, or any type of athletic clothing is not permitted.
- Baggy, sagging, form-fitting or hip-hugger pants are not permitted.

*TOPS*

- Shirts/tops may be solid, striped, plaid or an overall print.
- Shirts must have sleeves.
- No writing or pictures are allowed on the tops. Small logos (no larger than quarter size) are acceptable. Highlands spirit wear is permissible at any time.
- All tops should be of an appropriate size and fit, no form-fitting or baggy shirts will be permitted.
- Low, scoop, plunging or revealing necklines will not be permitted.
- Any material that is sheer or lightweight enough to be seen through will not be permitted.

### *COLD WEATHER WEAR*
- Sweaters, sweatshirts, vests and pullovers are permitted, but must follow all color and fit guidelines specified in "Tops" above.

### *DRESSES, JUMPERS AND SKIRTS*
- Must meet all previous guidelines regarding fit and length[.]
- All dresses must also meet the requirements listed under TOPS above.
- Skirts must be mid-thigh or longer.