*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0027p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOEL CURRY, a minor, by and through his parents,
PAUL & MELANIE CURRY,

*Plaintiff-Appellant,*

*v.*

IRENE HENSINER, Principal Handley School,

*Defendant-Appellee,*

SAGINAW CITY SCHOOL DISTRICT,

*Defendant.*

No. 06-2439

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-10143—David M. Lawson, District Judge.

Argued: September 14, 2007

Decided and Filed: January 16, 2008

Before: NORRIS, GIBBONS, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jeffrey A. Shafer, ALLIANCE DEFENSE FUND, Washington, D.C., for Appellant. Mary Massaron Ross, PLUNKETT & COONEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Jeffrey A. Shafer, ALLIANCE DEFENSE FUND, Washington, D.C., for Appellant. Mary Massaron Ross, PLUNKETT & COONEY, Detroit, Michigan, for Appellee. Steven W. Fitschen, NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia, for Amicus Curiae.

---

## OPINION

---

ALAN E. NORRIS, Circuit Judge. In this appeal, we address whether an elementary school student has a First Amendment right to promote an unsolicited religious message during an organized curricular activity.

Plaintiff Joel Curry and his parents filed suit against the School District of Saginaw, Michigan, and Irene Hensinger, the principal of the school Joel attended, alleging that Joel's constitutional rights were abridged when Principal Hensinger did not allow Joel to "sell" pipe-cleaner candy canes if a card bearing a religious message was attached. A "sale" of goods was to

1

occur at a three-day simulated marketplace event that existed as part of the fifth grade curriculum at Joel's elementary school.

The district court granted defendants' motion for summary judgment as to all parties. It first reasoned that no violation of Joel's First Amendment right could be attributed to the school district. Turning to Principal Hensinger, the court concluded that she had abridged Joel's constitutional right to freedom of speech, but enjoyed qualified immunity from liability because the precise contours of that right were not clearly established.

On appeal, Plaintiff contends that the district court erred in its application of qualified immunity to Principal Hensinger. We conclude that Principal Hensinger did not violate a constitutional right enjoyed by Joel and we therefore affirm the district court's grant of summary judgment, albeit on different grounds.

## I.

Joel Curry was a fifth grade student at the Handley School in Saginaw, Michigan during the 2003-2004 academic year. As part of the fifth grade curriculum, students participated in an exercise called "Classroom City." The event was designed to provide students a variety of learning experiences including exposure to literature, marketing, government, civics, economics, and mathematics. The exercise culminated in a three-day event held in the school gymnasium during which students, using faux school currency, sold goods they had produced specifically for the event.

Lisa Sweebe, Joel's social studies teacher, managed the exercise. In early November, Sweebe sent out packets to students and their parents describing Classroom City and what was expected of the students. The 2003 Classroom City was held on December 11, 12, and 16. The guidelines for the assignment stated:

• You will need to create, market, and sell a product for the simulation Class Room City.
• You cannot sell or use food products.
• You cannot play or sell games of chance.
• Your product must be something that is handmade.
• Materials and supplies cannot exceed $10.00 in cost.
• You can sell as many as three different products.
• You will need a sample of your product(s) to do an all school market survey. You will receive more details from your math teacher concerning the market survey.
• Your market analysis will help you determine how much inventory you will need to start your business.
• Remember as you prepare for your business that part of the spirit of the competition is to have a product that stands out from all the others.

As indicated above, before a product could be approved for sale, students were required to conduct a market survey. Participants created a prototype of their products, and a representative sample of the student body taken from all grades was asked to indicate which products they might be willing to purchase. During the actual three-day event, the entire student body, under the supervision of the physical education instructor, attended Classroom City and made purchases at the mock storefronts with the faux currency. The stores were monitored to see which students accumulated the most money.

At the suggestion of his mother, Joel decided to make Christmas tree ornaments in the shape of candy canes utilizing pipe cleaners and beads. Joel's father offered to create cards to attach to the

ornaments explaining how the candy cane can be viewed as a symbol of Christianity. However, when Joel submitted his ornament prototype for the market survey, he did not attach the card.

Sometime after the market survey was completed, Joel added a card to the ornaments he planned to sell during Classroom City. It read as follows:

The Meaning of the Candy Cane

Hard candy: Reminds us that Jesus is like a "rock," strong and dependable.

The color Red: Is for God's love that sent Jesus to give his life for us on the cross.

The Stripes: Remind us of Jesus' suffering–his crown of thorns, the wounds in his hands and feet; and the cross on which he died.

Peppermint Flavor: Is like the gift of spices from the wise men.

White Candy: Stands for Jesus as the holy, sinless Son of God.

Cane: Is like a staff used by shepherds in caring for sheep. Jesus leads us and watches over us when we Trust him.

Joel and his parents did not alert school administrators to the addition of the card.

Joel was paired for the exercise with Siddarth Reddy. The two decided that Siddarth would prepare the storefront and Joel would prepare the products to sell. When Siddarth learned of the card, he informed Joel that "[n]obody wants to hear about Jesus." Siddarth subsequently decided to make his own products for sale, resulting in his bearing the burden of both constructing the storefront and making a product for sale. During the event itself, Joel manned the storefront during the morning hours and Siddarth during the afternoon.

On December 11, 2003, the first day of the Classroom City event, Jennifer Harris, the gym teacher, who was supervising Classroom City, sought the counsel of Lisa Sweebe when she discovered that Joel was "selling religious items." Sweebe proceeded to Joel's storefront to see what he was selling. Joel showed Sweebe his ornament with the attached card. Sweebe asked Joel if the card had been attached at the time of the market survey, and Joel said that it had not. Although Joel's product did not violate the rules of Classroom City, Sweebe told Joel that he could not sell the ornament with the card attached until she had a chance to talk with the principal, Irene Hensinger. She further stated that he had done nothing wrong, but she was concerned about the card's religious content and whether other students might be offended. For the rest of the day, Joel sold his ornaments without the card.

Sweebe initially was unable to locate Hensinger. Around noon, Joel's mother arrived at the school. After learning that Joel was not permitted to sell the ornament with the attachment, she told Sweebe that the use of the cards fell within Joel's constitutional rights as a student and offered to bring in some literature supporting her position.

Later that afternoon, Sweebe left a note for Hensinger, which included a copy of the card's content along with the question, "Can this be sold? Mom says this is within Joel's rights? I need your okay." Later, when Sweebe discussed the matter with Hensinger, she also provided the literature that Joel's mother had furnished. Hensinger, in turn, passed the information on to assistant superintendent Dr. John Norwood.

That evening at home, Joel told his mother that he wished to sell the ornaments with the card so that others could learn about Jesus. The following day, December 12, Joel's mother placed a copy of an article written by an attorney entitled "Students' Rights on Public School Campuses" in Sweebe's school mailbox. She included a note informing Sweebe, "[t]here is just a ton of info on the internet [sic] from various organizations. Some of the groups are even offering free counsel to anyone who may have questions about students' rights to free speech."

This article along with the note was also forwarded to Dr. Norwood by Hensinger. At some point between December 12 and 16, Hensinger spoke to Dr. Norwood about Joel's ornament and attached card. Both were of the opinion that the use of the card was inappropriate. On the morning of December 16, Hensinger met with Joel's mother and informed her that, after consideration, the school would not permit Joel to sell the ornaments with the attached card. Hensinger further stated that Classroom City was considered instructional time and, because the cards contained religious content, their use would not be permitted. If Joel still wished to sell the candy canes with the card, he could do so after school in the parking lot. Joel did not attempt to sell his ornaments with the cards in the parking lot. Instead, he sold the ornaments without the cards during the exercise.

Joel received a grade of "A" for his part of the Classroom City project, and was not disciplined for attempting to sell the candy canes with the religious cards. The parties agree that Hensinger's actions were taken in her official capacity as principal of the school.

## II.

We review a district court's grant of summary judgment *de novo*, employing the same standard as the district court. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A. Qualified Immunity

A claim of qualified immunity is ordinarily examined in two steps: "[f]irst, a court must consider whether the facts, viewed in the light most favorable to the plaintiff, 'show the offic[ial's] conduct violated a constitutional right,'" and second, "the court must then decide 'whether the right was clearly established.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Sixth Circuit has occasionally expanded that inquiry into a three-step sequential analysis: "The first inquiry is whether the Plaintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is 'whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights.'" *Tucker v. City of Richmond, Ky.,* 388 F.3d 216, 219 (6th Cir. 2004) (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)). The third inquiry impacts the analysis when *despite* the violation of a clearly established constitutional right, the official's conduct was objectively reasonable, and so should still enjoy qualified immunity. *See Sample v. Bailey*, 409 F.3d 689, 696 n.3 (6th Cir. 2005) ("If we find the first two requirements have been met, the final inquiry is 'whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003))).

### B. Constitutional Right

Plaintiff's complaint alleged multiple possible constitutional violations relating to the suppression of Joel's card, including the right to freedom of expression, and free exercise of religion.

The district court decided, and "plaintiffs agreed that the free exercise claim was subsumed in the free expression claim." *Curry ex. rel. Curry*, 452 F. Supp. 2d 723, 740 (E.D. Mich. 2006). On appeal, Plaintiff claims only a violation of the constitutional right to freedom of speech.

In order to determine whether said constitutional right was violated in this case, we must first decide the framework under which Joel's speech should be analyzed. If the expression was private expression, which just happened to occur at school, we look to *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969) (noting that private expression may be restricted only upon a showing that such expression "would substantially interfere with the work of the school or impinge upon the rights of other students"). However, when the expression is school-sponsored speech, such as a school newspaper, or speech made as part of a school's curriculum, schools are afforded greater latitude to restrict the speech. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) ("[E]ducators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.").

It is undisputed that Classroom City was part of the fifth grade curriculum. According to the Supreme Court, the *Hazelwood* standard applies when

> students, parents, and members of the public might reasonably perceive [the expression] to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

*Hazelwood*, 484 U.S. at 271. Plaintiff suggests that *Hazelwood* only applies if the audience might mistake the speech as originating from the school. However, that reading is too narrow.[1] This court has applied the *Hazelwood* standard when the speech at issue was made as part of school activities:

> The Supreme Court has drawn a distinction between "personal expression that happens to occur on school premises" and expressive activities that are "sponsored" by the school and "may fairly be characterized as part of the school curriculum. . . ." *Hazelwood*, 484 U.S. at 271, 108 S. Ct. at 569-570, 98 L. Ed. 2d at 605. Speech sponsored by the school is subject to "greater control" by school authorities than speech not so sponsored, because educators have a legitimate interest in assuring that participants in the sponsored activity "learn whatever lessons the activity is designed to teach. . . ." *Id.* As long as the actions of the educators are "reasonably related to legitimate pedagogical concerns," therefore, the *Hazelwood* Court held, as we have seen, that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities. . . ." *Id.*, 484 U.S. at 272, 108 S. Ct. at 571, 98 L. Ed. 2d at 606.

*Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989). Expressive activities made as part of the school curriculum call for a *Hazelwood* analysis, while the high standard of *Tinker* is reserved for

---

[1] For speech to be perceived as bearing the imprimatur of the school does not require that the audience believe the speech originated from the school, only that an observer would reasonably perceive that the school approved the speech. Imprimatur is defined as "[o]fficial approval; sanction." *American Heritage Dictionary* 822 (4th ed. 2000); *see also Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 763 (1995) (stating that an "open forum in a public university does not confer any *imprimatur of state approval* on religious sects or practices.") (emphasis added) (citation omitted). Classroom City products were to be approved by the school, and this fact was known by students and parents. Even though Joel and his parents circumvented the product approval process, students and parents were unaware of this, and reasonably would have perceived the product as school-approved if it had been sold.

when the "problem involves direct, primary First Amendment rights akin to 'pure speech.'" *Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 468 (6th Cir. 2000) (quoting *Tinker*, 393 U.S. at 508).

"While children [] do not 'shed their constitutional rights . . . at the schoolhouse gate,' the nature of those rights is what is appropriate for children in school." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655-56, (1995) (quoting *Tinker*, 393 U.S. at 506). Local school officials are best situated to determine what is appropriate for children in school, and constitutional claims have consistently been given a less rigorous review in school settings. *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 393 (6th Cir. 2005) ("The Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.") (quoting *Tinker*, 393 U.S. at 507). The *Blau* court went on to state that "[i]n the First Amendment arena and other arenas as well, the Supreme Court thus has frequently emphasized that public schools have considerable latitude in fashioning rules that further their educational mission and in developing a reasonable fit between the ends and means of their policies." *Id.* "'The very complexity of the problems of . . . managing a statewide public school system suggests that there will be more than one constitutionally permissible method of solving them.'" *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 237 (6th Cir. 2005) (Sutton, J., concurring) (quoting *San Antonio Indep. Sch. Dist. v. Rodriquez*, 411 U.S. 1, 42 (1973)). It is often the case that "the determination of what manner of speech in the classroom . . . is inappropriate properly rests with the school board rather than with the federal courts." *Id.* (quoting *Hazelwood*, 484 U.S. at 267).

The district court declined to decide the standard under which to judge the constitutionality of preventing Joel Curry from selling his product with the religious card attachment. Instead, it held that "the defendant's restriction of Joel Curry's speech cannot be justified even under *Hazelwood*'s more generous standards." *Curry*, 452 F. Supp. 2d at 735. Because we conclude that the appropriate standard is that of *Hazelwood*, the restriction of Joel's expression was constitutionally permissible only if it was "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273.

The district court confined its analysis of pedagogical concerns to the academic variety, stating that "[t]he lessons Classroom City was designed to teach presumably included economics, marketing, civics, and entrepreneurialism. Standing alone, the candy canes with a religious card attached met those ostensible goals." *Curry*, 452 F. Supp. 2d at 736. However, "[t]he universe of legitimate pedagogical concerns is by no means confined to the academic . . . ." *Poling*, 872 F.2d at 762 (teaching a student civility toward others is a legitimate pedagogical concern). Plaintiff at oral argument emphasized that the written instructions distributed before the event did not preclude a religious product. However, the constitutional analysis of the restriction would be the same whether the school proscribed religious products before or during the event. The fact that student expression as part of a curricular activity meets the stated parameters of an assignment does not insulate it from school regulation.

"In an elementary school setting, the appropriateness of student expression depends on several factors, including the type of speech, the age of the locutor and audience, the school's control over the activity in which the expression occurs, and whether the school solicits individual views from students during the activity." *Walz ex. rel. Walz*, 342 F.3d 271, 278 (3d Cir. 2003) (holding that a student's First Amendment right to freedom of speech was not violated when the student was prevented from passing out candy canes with a religious card attached at a classroom party). Joel's candy cane with the religious card attached was not simply a personal religious observance, analogous to wearing a cross, or a t-shirt with a slogan. The expression was part of a curricular assignment, and not one that invited personal views—the assignment encouraged creative products, but it did not solicit viewpoints. The *Walz* court noted that there is "a marked difference between expression that symbolizes individual religious observance, such as wearing a cross on a necklace, and expression that proselytizes a particular view." *Id.* at 278-79 (citing *Hills v. Scottsdale*

*Unified Sch. Dist.*, 329 F.3d 1044, 1053 (9th Cir. 2003) ("The [School] District cannot refuse to distribute literature advertising a program with underlying religious content where it distributes quite similar literature for secular summer camps, but it can refuse to distribute literature that *itself* contains proselytizing language. The difference is subtle but important.")).

In this case, the admitted purpose of the plaintiff in distributing the candy cane was to promote Jesus to the other students. The school's assignment requiring students to develop products for sale in Classroom City cannot be seen as a solicitation of personal views on a subject; Joel was in fifth grade and the potential audience included much younger students (these products were to be sold to the entire elementary school student body); and the school had complete control over Classroom City, including a formal approval process for the products to be sold, which Joel evaded.

"It is only when the decision to censor . . . student expression has no valid educational purpose that the First Amendment is so directly and sharply implicated as to require judicial intervention to protect students' constitutional rights." *Hazelwood*, 484 U.S. at 273 (citation omitted). *Hazelwood* does not require us to balance the gravity of the school's educational purpose against Joel's First Amendment right to free speech, only that the educational purpose behind the speech suppression be valid. Here, the principal decided that allowing the card would not be appropriate because it was religious, and therefore could offend other students and their parents (in fact the religious card *did* offend Joel's business partner for Classroom City). The school's desire to avoid having its curricular event offend other children or their parents, and to avoid subjecting young children to an unsolicited religious promotional message that might conflict with what they are taught at home qualifies as a valid educational purpose. *See Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) ("Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family.").

Notably, we are not called upon to evaluate whether the principal made the *best* decision in disallowing the card. "[A] federal court is obviously not the ideal body to try to answer such a question." *Poling*, 872 F.2d at 761. Instead we hold only that the principal's determination that the religious card should not be permitted was the product of her reasonable evaluation of legitimate pedagogical concerns, and fell within her discretion as a school administrator, and therefore did not violate any right Joel enjoyed under the First Amendment.

## III.

Because we conclude that Principal Hensinger's decision to prevent Joel from selling the candy cane with its religious attachment was driven by legitimate pedagogical concerns, Joel's constitutional rights were not abridged. Since there was no constitutional violation, the qualified immunity inquiry is ended. We **AFFIRM** the district court's grant of summary judgment for the defendant.