S. H. KING, Mayor and Cecil E. Byrd, William B. Hatcher, Bud Allison, William R. (Billy) Moore, Joe J. Faison, Jr., and H. Donald Holman, Aldermen of the City of Fayetteville, in their official capacity as the Board of Mayor and Aldermen of the City of Fayetteville, Tennessee, and Charles Burklin, William R. (Billy) Moore, Gerald Haislip, Sam Ashby, Jr., and T. C. Widner, in their official capacity as the City of Fayetteville Water and Sewer System Board, Petitioners,

v.

Thomas A. BROOKS, Paul W. Hancock, Sr., and John R. O'Neal in their official capacity as commissioners of the Highland Rim Utility District of Lincoln County, Tennessee and T. V. Faulkner, Bill Farrar and Edward Sullivan in their official capacity as commissioners of the Mulberry Utility District, Respondents.

Supreme Court of Tennessee.

March 6, 1978.

Thomas O. Bagley, Stevens, Bagley & Stevens, Fayetteville, for petitioners.

Fred I. Womack, Womack & Mason, Don Wyatt, Fayetteville, for respondents.

COOPER, Justice.

OPINION

This is a suit for breach of contract. The controlling issue is whether and to what extent an interpretation of the contract provision in dispute made in a prior action between the parties is binding on them in the present suit, and dispositive of the questions presented in it.

In 1965 and 1966, respectively, the City of Fayetteville entered into contracts with the Highland Rim Utility District and the Mulberry Utility District in which the City agreed to furnish water to the districts. The following provision appeared as paragraph four of both contracts:

The rates to be paid by the District for water consumed in each calendar month shall be twenty cents for each thousand (1000) gallons. In the event the City shall increase or reduce the lowest resi-

dential rate to all other customers supplied by its water system, then the rate to the district herein provided, shall be increased or reduced in the same ratio as the residential rate is increased or reduced to all other customers.

The rate schedule in effect at that time provided for a minimum charge of $3.25 for the first 300 cubic feet of water used. The rate decreased as the amount of water used increased, reaching a low rate of thirty cents per 100 cubic feet after the consumption of 3,000 cubic feet. In 1974, the City increased the rates, with the new schedule providing for a minimum charge of $2.75 for the first 100 cubic feet, and for graduated reductions down to 27 cents per 100 cubic feet after the consumption of two million cubic feet. The City calculated that the rate increase applicable to the utility districts under paragraph four of the contracts was 46.6 percent, the percentage increase of the 1974 minimum charge over the 1965 minimum charge, and adjusted the rate charged the districts accordingly. The utility districts brought suit against the City, contending that this interpretation of the contract provision was incorrect. The chancellor agreed, noting that the minimum charge used by the City to determine the districts' rate increase was in fact the highest residential rate, rather than the lowest, which is the proper basis for the calculation of the rate increase applicable to the districts under paragraph four of the contracts. Construing that paragraph, the chancellor found

. . . that ["lowest residential rate"] was intended to mean the lowest residential rate all customers would pay, taking into account the whole residential rate structure . . . [,]

and that the increase in the rates payable by the utility districts upon an increase in the general residential rate structure should be computed as follows:

[C]ompute the cost of water to be used by a utility district . . . at the residential rates shown in the 1965 and [new] schedules as if the district was to pay for the water at these rates. Compute the percentage of change and apply it to the

rate mentioned in the contract. Use the changed rate to compute the cost of water to the district.

The chancellor's decree has become final.

In 1975, a new rate schedule was issued, calling for a minimum charge of $3.25 for the first 100 cubic feet, a charge of $1.10 per 100 cubic feet for the next 900 cubic feet, and a charge of 80 cents per 100 cubic feet after the consumption of the first 1,000 cubic feet. The City determined the percentage increase applicable to the rates paid by the utility districts in the manner set forth in the chancellor's decree. The utility districts then filed the instant case, contending in substance that the application of the method of determining the increase in the districts' rates set forth in the chancellor's decree to the 1975 rate schedule produced an inequitable result. The City moved for summary judgment on a plea of res judicata, asserting that the chancellor's opinion in the prior suit was controlling. The chancellor granted the motion. On appeal, the Court of Appeals reversed, and remanded the case for trial. The City petitioned for certiorari.

█ In determining the effect of the prior judgment on the present action, a distinction must be made between the concepts of res judicata and collateral estoppel. *See Shelley v. Gipson,* 218 Tenn. 1, 400 S.W.2d 709 (1966). The maintenance of the present action is not barred by the doctrine of res judicata, which, strictly speaking, bars the bringing of a suit on a cause of action that has already been the subject of a final judgment in prior litigation. *See National Cordova Co. v. City of Memphis,* 214 Tenn. 371, 380 S.W.2d 793 (1964). That situation is not presented here, for, although the subject matter of the two suits between the districts and the City is the same, the cause of action that is the basis for each is not: Fayetteville's alleged present breach of contract gives rise to a cause of action distinct from that which arose as a result of the alleged breach that was the subject of the suit based on the 1974 rate increase. *See Copeland v. Cope-*

*land,* 180 Tenn. 609, 177 S.W.2d 555 (1944). However, although the new action itself is not barred as the result of prior litigation, the relitigation of certain facts determined in the former action is. Under the doctrine of collateral estoppel, when an issue has been actually and necessarily determined in a former action between the parties, that determination is conclusive upon them in subsequent litigation. *See Shelley v. Gipson, supra* ; *A. L. Kornman v. Metropolitan Government of Nashville and Davidson County,* 216 Tenn. 205, 391 S.W.2d 633 (1965); *Pile v. Pile,* 134 Tenn. 370, 183 S.W.2d 1004 (1916).

The meaning of paragraph four of the contracts was at issue in the prior suit between these parties. The chancellor was called upon to interpret the provision by determining the meaning of the terms "lowest residential rates." The chancellor defined "lowest residential rate" by providing a method, or formula, for its computation. The definition of "lowest residential rate" is the essence of the chancellor's interpretation of the contracts, and the method by which that rate is computed is the essence of that definition—it *is* the definition of these terms for the purpose of these contracts and these parties, and is conclusive upon them in the present action.

The method by which the "lowest residential rate" is computed may not be altered without altering the chancellor's definition of those terms, and his interpretation of the contract provision. That we may not do. Although the parties—or, for that matter, this court—may disapprove of the result of the application of the chancellor's definition to the 1975 rate schedule, that definition may not be questioned at this time and in this action. Any objections should have been raised on appeal of the prior case. They were not, and thus the parties are bound, as are we.

If the chancellor's definition of "lowest residential rate" and his interpretation of the contract provision at issue, as set forth in his opinion in the prior action, are applied to the present case, it is apparent the Fayetteville's action in raising the rates

charged the utility districts was proper under the contracts. Accordingly, the chancellor's grant of summary judgment to the City was correct.

The judgment of the Court of Appeals is reversed, and the case dismissed. The costs will be taxed to the respondents.

HENRY, C. J., and HARBISON, J., concur.

FONES and BROCK, JJ., dissent.

FONES, Justice, dissenting.

### OPINION

I respectfully dissent.

I agree that the Chancellor's construction in the first suit, of the ambiguous paragraph tying increases to the "lowest residential rate to all other customers" is binding on the parties in this suit.

I do not agree with the majority's assertion that the mathematical formula used in the first suit to determine the percent of increase of the 1974 rate schedule over the 1965 rate schedule "is the essence of the Chancellor's decision."

In deciding the first case between these parties, the Chancellor noted that Fayetteville had used only the percentage of increase by which the 1974 minimum charge exceed the 1965 minimum charge, to calculate the rate due by the Utility Districts under paragraph four of the contracts. He correctly observed that the minimum charge was in fact the highest residential rate and that the lowest rate was the last figure in the schedule, applicable after the consumption of 3,000 cubic feet in 1965, 2,000 in 1969, and 2,000,000 in 1974.

Construing paragraph four of the contract, the Chancellor held as follows:

"It is deduced that the lowest residential rate as used in the contracts was not intended by the parties to mean either the lowest rate mentioned in the schedule or the minimum rate. It is concluded instead that it was intended to mean the lowest residential rate all customers would pay, taking into account the whole

residential rate structure. The contracts are speaking of the lowest residential rate 'to all other customers' and these customers pay rates based on the amount of water used from a minimum to a maximum."

In his memorandum opinion, the Chancellor approximated the "composite increase" applicable to Mulberry on a consumption of 70,000 cubic feet per month to be about fifty (50%) percent and about thirty (30%) percent applicable to Highland Rim, on 600,000 cubic feet per month, and directed the parties make the necessary calculations.

In the final judgment, entered May 2, 1975, a formula to compute the rate to charge the Utility Districts in any given month was expressed as follows:

" . . . to determine if a change has been made in the 'lowest residential rate' as used in the contracts, compute the cost of water to be used by a utility district in any given month at the residential rates shown in the 1965 and 1974 schedules as if the district was to pay for the water at these rates. Compute the percentage of change and apply it to the rate mentioned in the contract. Use the changed rate to compute the cost of water to the district."

In the second case, Fayetteville filed an answer and the affidavit of the manager of the water system, setting out the 1975 residential rate schedule and a detailed calculation of the rate to be charged Highland Rim and Mulberry for the month of July, 1975, using the formula prescribed in the final decree of May 2, 1975. Fayetteville's motion for summary judgment on the ground the 1975 rate increase had been applied in accord with the construction of the contract made by the Court in the prior suit was sustained.

It is necessary to distinguish between the Chancellor's interpretation of paragraph four, as expressed in his memorandum opinion, which is a part of the final decree in the first suit, and the formula applied to the 1974 rate schedule. That formula produced a result that was in accord with paragraph four, when applied to the 1974 rate schedule, but it can be readily seen that it does not do so when applied to the 1975 schedule. It is paragraph 4 of the contracts that controls computation of the increased rate to be charged Highland Rim and Mulberry, not the formula used to compute the 1974 rates. The application of that formula to the 1975 rates appears to have produced a result inconsistent with the intent of the contracts.

The gravamen of the second action was that the formula applied to the 1975 schedule resulted in an increase of Highland Rim's rate from 19.35 cents to 39.9 cents per 100 cubic feet, in excess of one hundred (100%) percent, and an increase of Mulberry's rate from 23.06 cents to 39.18 cents per one hundred (100) cubic feet, in excess of seventy (70%) percent; that the 1975 rates have increased the cost of water to residential users only eleven (11) to thirteen (13%) percent; that the 1975 schedule does not have a proportionate "across the board" rate of increase, but volume commercial users are charged as low as thirty-eight (38) cents per one hundred (100) cubic feet while the lowest rate in the formula applied to the Utility Districts' contracts is eighty (80) cents. Plaintiffs alleged that the 1975 schedule was deliberately structured and designed to produce that inequitable result, in combination with the formula used in 1974, because of Fayetteville's dissatisfaction with the Utility District contracts.

The record before us reflects that the 1975 rate schedule was structured in a manner that represented a substantial departure from the three (3) prior rate schedules issued during the life of the contracts. Prior schedules contained reduced rates as volume increased, the 1974 schedule reducing from eighty (80) cents per one hundred (100) cubic feet after the first one thousand (1,000) cubic feet to a low of twenty-seven (27) cents per one hundred (100) cubic feet.

The 1975 schedule, the subject of this suit, did not reduce any after reaching its lowest rate of eighty (80) cents per one hundred (100) cubic feet after the first one thousand (1,000) cubic feet. However, a *commercial* rate schedule was simultaneously issued that carried a scheduled reduction

downward to its lowest rate of thirty-eight (38) cents per one hundred (100) cubic feet. The complaint of the utility districts alleges that 1975 was the first rate schedule to contain a commercial rate schedule and, so far as the record before us reflects, that is true.

In my opinion, the utility districts were entitled to a trial on the merits of their allegations that Fayetteville deliberately and in bad faith designed a 1975 rate schedule that, when computed by the 1974 mathematical formula, produced a disproportionate increase to them, as compared to residential users, in violation of paragraph four (4) of the contract. Therefore, I would affirm the result reached by the Court of Appeals and remand the case for trial.

I am authorized to state that Justice BROCK concurs in this dissent.