# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 28, 2014 Session

## PHYLLIS LOUISE BIGE v. CITY OF ETOWAH

**Appeal from the Circuit Court for McMinn County**
**No. 2013-CV-200      J. Michael Sharp, Judge**

---

**No. 2014-00271-COA-R3-CV-FILED-DECEMBER 4, 2014**

---

Phyllis Louise Bige, a former police officer with the City of Etowah, brought this retaliatory discharge action against the City, alleging that she was fired because of her failure to meet a quota for citations. Her claim was predicated on Tenn. Code Ann § 39-16-516 (2014). The trial court granted defendant summary judgment, finding that an earlier judgment of the United States District Court dismissing plaintiff's federal claims – including a claim that her substantive due process rights were violated because defendant required her to commit an illegal act – collaterally estopped plaintiff from proceeding with her retaliatory discharge claim under Tenn. Code Ann. § 50-1-304 (2014). We affirm the summary judgment of the trial court, but on different grounds. We hold that defendant demonstrated plaintiff's evidence is insufficient to establish a genuine issue of material fact as to two essential elements of her claim – (1) that she refused to participate in an illegal activity, and (2) that defendant fired her solely because of her refusal to participate in an illegal activity. We affirm the grant of summary judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Christopher D. Markel and Wilson C. von Kessler, II, Chattanooga, Tennessee, for the appellant, Phyllis Louise Bige.

Nathan D. Rowell and Brian R. Bibb, Knoxville, Tennessee, for the appellee, City of Etowah.

# OPINION

## I.

Plaintiff was employed as an Etowah police officer from February 21, 2005, until her termination on May 18, 2011. By way of background, at the end of 2010, the chief of police resigned, and several officers applied for his position. A veteran police officer, Andy Shelfer, testified that the officers "took sides" in supporting their "own" candidates to replace the former chief. Eric Armstrong was named chief in February of 2011. It is undisputed (1) that Chief Armstrong was not the candidate that plaintiff had supported, and (2) that Chief Armstrong knew it. Shortly after becoming chief, he reorganized the chain of command to get rid of the rank of sergeant. Plaintiff and several others were returned to the rank of patrol officer, although plaintiff's salary and job description remained the same. Chief Armstrong selected Officer Bill Crawford to be plaintiff's supervisor. Plaintiff had previously trained Crawford.

On March 30, 2011, Chief Armstrong sent plaintiff an email warning her about her lack of citation writing activity during her shifts. The email stated as follows:

> Phyllis,
>
> You need to pick up your activity. It has been brought to my attention that you have only written a couple of tickets. Now I'm not saying you have a quota but we both know that you will see at least one violator in a 12 hour shift. I know what happened in the transition was difficult for you but it is time to put that behind you and look forward. I have confidence in your patrol abilities and I know you['re] capable of making excellent traffic stops and arrests.
>
> I hope you don't take this email as "picking on" you and instead consider it my trying to encourage you. Like I said before, I have confidence in you and I know you can do excellent work.

On May 18, 2011, plaintiff showed up for work with a brace on her hand. Officer Crawford told her that he didn't think she should be working injured. He was not confident that plaintiff, in her injured condition, would be able to draw her gun. Uncomfortable with the idea of plaintiff working with her injury, Officer Crawford said he was going to send her home and have someone cover her shift. Plaintiff insisted she was able to work. That same day, Chief Armstrong called plaintiff into his office and told her she was fired. Officer

-2-

Crawford was also present during the brief conversation. Plaintiff testified as follows regarding what happened:

> [Officer Crawford] insisted that he was going to get someone to cover the shift. And I kept telling him, "No, no, no, I'm fine. I don't want to go home." And he got someone to cover the shift.
>
> Then the next thing I knew, he said Eric Armstrong was coming in. . . . And Eric came in and terminated me.
>
> Q. What was the reason given for termination?
>
> A. He told me, he said, "I thought this was going to work out, but it's not. I'm terminating you." I said, "Eric, why? I haven't done anything." He said, "You don't write enough tickets. You got a poor attitude and you don't write tickets."
>
> Q. Okay.
>
> A. So I said, "Are you sure this is what you want [to] do?" And he said, "Yes." And I -- he said, "Turn in your badge or whatever else belongs to the department and leave." So that's what I did.

Officer Crawford testified that he did not have a recollection of what was said at the meeting. Chief Armstrong similarly had trouble remembering the specifics of what was said, but stated generally that he fired plaintiff for "poor attitude, negative attitude and also poor work performance," as shown by her lack of activity and "deficiency in patrolling."

Chief Armstrong emailed plaintiff a termination letter on May 18, 2011, that stated as follows:

> Dear Phyllis,
>
> On March 30, 2011 I notified you via e-mail that you needed to pick up your activity while working. You and I spoke about the level of activity expected and that officers need to always be on the watch for suspected violators. Your level of activity for the month of April was well below expectations and standards. The City of Etowah Police Department does not need officers that

-3-

are incapable or inefficient in their duties.

Upon taking over as Chief of Police, I spoke with you in detail about improving your attitude and demeanor while conducting yourself as a City of Etowah Police Ofcer. City Manager Gravely also spoke to you about your poor attitude and how it reflects negatively on the City of Etowah. In the March 30, 2011 e-mail I advised you to put the difficult transition behind you and to look forward.

When you reported for duty this evening for your 12 hour night shift I was informed you started complaining in a negative manner about your job. Officer Jeff Lynn reported that you complained about not receiving a new badge and having a piece of junk badge. Officer Lynn informed me that you stated there was a conspiracy against you. This is further proof of the bad attitude that will not be tolerated here.

Consequently, this letter serves as a written notice of employment termination and a copy will be placed in your permanent personnel file.

Plaintiff filed a complaint in the Chancery Court for McMinn County on September 21, 2011. She alleged that, by firing her, the City (1) impaired her vested contractual right to continued employment; (2) unconstitutionally took her property rights without just compensation; (3) violated her equal protection rights; and (4) wrongfully terminated her employment "in retaliation for [her] failure to write more traffic tickets in violation of T.C.A. § 39-16-516." Because of the federal claims, defendant removed the case to the United States District Court for the Eastern District of Tennessee. In federal court, plaintiff added a claim for violation of her substantive due process rights under 42 U.S.C. § 1983.

Following discovery, the federal district court granted defendant's motion for summary judgment on all federal claims. As will be discussed further below, the federal court held as a matter of law that defendant did not require plaintiff to violate Tenn. Code Ann. § 39-16-516. The court dismissed all federal claims, declined to exercise supplemental jurisdiction over plaintiff's state law claims, and remanded the matter back to state court. By agreed order, the case was transferred to the trial court. Defendant again moved for summary judgment, arguing that "Plaintiff's claims are barred by the doctrine of collateral estoppel, and, in the alternative, the Plaintiff cannot establish the elements of any of her remaining state law causes of action at trial." The trial court granted summary judgment on

all of the remaining claims, finding that "the doctrine of collateral estoppel applies in this case" and the rulings of the federal district court "collaterally estop each remaining state law claim." Plaintiff timely filed a notice of appeal.

II.

The only claim at issue on appeal is plaintiff's retaliatory discharge claim under the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304, often called "the Whistleblower Act." In her reply brief, plaintiff concedes that her claims for common law retaliatory discharge, breach of contract, and violation of the Tennessee Constitution, are "without merit."

The general issue before us is whether the trial court erred in granting summary judgment. Plaintiff phrases her issue as follows, quoted verbatim from her brief:

> Whether the Trial Court erred in finding that [plaintiff] was collaterally estopped from claiming that she refused to participate in an illegal activity – the writing of unwarranted tickets – within the meaning of the Tennessee Retaliatory Discharge Statute, Tenn. Code Ann. § 50-1-304, based upon the Federal Court order dismissing her Federal Court Claims and remanding her retaliatory discharge claim to the Trial Court.

III.

Because the complaint was filed after July 1, 2011, the effective date of Tenn. Code Ann. § 20-16-101 (Supp. 2014), the statute applies to our analysis of summary judgment in this case. That statute provides:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
>
> (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or
>
> (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

*See Harris v. Metro. Dev. & Housing Agency*, No. M2013-01771-COA-R3-CV, 2014 WL 1713329 at *3 (Tenn. Ct. App. M.S., filed Apr. 28, 2014); *Wells Fargo Bank, N.A. v. Lockett*, No. E2013-02186-COA-R3-CV, 2014 WL 1673745 at *2 (Tenn. Ct. App. E.S., filed Apr. 24, 2014). As we observed in *Harris*,

> [s]ummary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.
>
> Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003). The resolution of a motion for summary judgment is a matter of law, thus, we review the trial court's judgment de novo with no presumption of correctness. *Martin v. Norfolk Southern Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008). The appellate court makes a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S .W.2d 49, 50-51 (Tenn. 1977).

2014 WL 1713329 at *4. In addressing a grant of summary judgment,

> [w]e must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox Cnty. Bd of Educ*., 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed facts support only one conclusion, then the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. See *White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

*Wells Fargo Bank,* 2014 WL 1673745 at *2.

In *Sykes v. Chattanooga Housing Authority*, 343 S.W.3d 18, 26 (Tenn. 2011), the Supreme Court stated as follows regarding the summary judgment standard as applied to

retaliatory discharge cases that accrued before June 10, 2011:

> In the recent cases of **Kinsler** [**v. Berkline, LLC**, 320 S.W.3d
> 796 (Tenn. 2010)] and **Gossett v. Tractor Supply Co.**, 320
> S.W.3d 777 (Tenn. 2010), this Court held that the **Hannan**
> summary judgment analysis is to be applied in retaliatory
> discharge actions in the same way as in other cases, and rejected
> the federal **McDonnell Douglas** framework of allocation of
> burdens and order of presentation of proof of each party in favor
> of the ordinary Tennessee summary judgment standard. **Gossett**,
> 320 S.W.3d at 785–86; **Kinsler**, 320 S.W.3d at 801.

(Footnotes omitted.) The **Sykes** Court, in footnote 4 of the opinion, cited 2011 Tenn. Pub. Acts 461, an amendment to Tenn. Code Ann. §§ 4-21-311, 50-1-304, and 50-1-701, that functionally overruled the retaliatory discharge summary judgment analysis in **Kinsler** and **Gossett**, and observed that the amendment is "applicable to causes of action accruing on or after June 10, 2011." *See* 2011 Tenn. Pub. Acts 461; **Coleman v. Humane Society of Memphis**, No. W2012-02687-COA-R9-CV, 2014 WL 587010 at *8, n.7 (Tenn. Ct. App. W.S., filed Feb. 14, 2014). In this case, plaintiff's cause of action accrued no later than May 18, 2011, the date her employment was terminated. **Weber v. Moses**, 938 S.W.2d 387, 392-93 (Tenn. 1996); **Weaver v. Diversicare Leasing Corp.**, No. E2013-01560-COA-R3-CV, 2014 WL 3734579 at *13 (Tenn. Ct. App. E.S., filed July 28, 2014). Thus, the law prior to the 2011 amendment applies.

IV.

A.

We first address the collateral estoppel issue. The Supreme Court has set forth the appropriate analysis of an issue involving the collateral estoppel doctrine:

> Collateral estoppel is a judicially created issue preclusion
> doctrine that promotes finality, conserves judicial resources, and
> prevents inconsistent decisions. It bars the same parties or their
> privies from relitigating in a later proceeding legal or factual
> issues that were actually raised and necessarily determined in an
> earlier proceeding. **Barnett v. Milan Seating Sys.**, 215 S.W.3d
> 828, 835 (Tenn. 2007); **Massengill v. Scott**, 738 S.W.2d 629,
> 631-32 (Tenn. 1987); **Blue Diamond Coal Co. v. Holland–Am.
> Ins. Co.**, 671 S.W.2d 829, 832 (Tenn. 1984). Thus, when an

issue has been actually and necessarily determined in an earlier proceeding between the parties, that determination is conclusive against the parties in subsequent proceedings. *King v. Brooks*, 562 S.W.2d 422, 424 (Tenn. 1978); *Shelley v. Gipson*, 218 Tenn. 1, 7, 12, 400 S.W.2d 709, 711-12, 714 (1966).

The party invoking collateral estoppel has the burden of proof. *State v. Scarbrough*, 181 S.W.3d 650, 655 (Tenn. 2005); *Dickerson v. Godfrey*, 825 S.W.2d at 695; *Fowlkes v. State*, 82 Tenn. 14, 18-19 (1884). To prevail with a collateral estoppel claim, the party asserting it must demonstrate (1) that the issue to be precluded is identical to an issue decided in an earlier proceeding, (2) that the issue to be precluded was actually raised, litigated, and decided on the merits in the earlier proceeding, (3) that the judgment in the earlier proceeding has become final, (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier proceeding, and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier proceeding to contest the issue now sought to be precluded. *Gibson v. Trant*, 58 S.W.3d at 118 (Birch, J., concurring and dissenting) (citing *Beaty v. McGraw*, 15 S.W.3d 819, 824–25 (Tenn. Ct. App. 1998)).

*     *     *

The question of whether collateral estoppel applies is a question of law. Accordingly, summary judgment is an appropriate vehicle for resolving a collateral estoppel claim.

*Mullins v. State*, 294 S.W.3d 529, 534-35 (Tenn. 2009) (footnotes and some internal citations omitted). The *Mullins* Court provided the following further guidance to Tennessee courts addressing the applicability of the collateral estoppel doctrine:

When a party invokes the doctrine of collateral estoppel, the court must first identify the legal or factual issues that were decided in the earlier proceeding. Then the court must identify the issue or issues sought to be precluded in the later proceeding. Finally, the court must determine whether the issue or issues sought to be precluded in the later proceeding are the

-8-

same as the issue or issues that were actually decided in the earlier proceeding. *For the doctrine of collateral estoppel to apply, the issue or issues sought to be precluded in the later proceeding must be identical, not merely similar, to the issue or issues decided in the earlier proceeding.* ***Patton v. Estate of Upchurch***, 242 S.W.3d 781, 787 (Tenn. Ct. App. 2007).

*Id.* at 536 (emphasis added).

We focus on the first element of collateral estoppel: "whether the issue to be precluded is identical to an issue decided in an earlier proceeding." *Id.* at 535. The federal district court addressed the issue of whether defendant was entitled to summary judgment on plaintiff's claim for violation of her substantive due process rights. To provide a full and clear picture of how the federal court framed and addressed the issue before it, we quote at length from its memorandum opinion:

> Plaintiff's final federal claim alleges a violation of her right to substantive due process. Substantive due process is " '[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.' " ***Does v. Munoz***, 507 F.3d 961, 964 (6th Cir. 2007) (quoting ***Bowers v. City of Flint***, 325 F.3d 758, 763 (6th Cir. 2003)). However, "[t]hese limitations are meant to provide 'heightened protection against government interference with certain fundamental rights and liberty interests.' " *Id.* (quoting ***Seal v. Morgan***, 229 F.3d 567, 574 (6th Cir. 2000)). These interests "include those protected by specific constitutional guarantees, such as the Equal Protection Clause, freedom from government actions that shock the conscience, and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental." ***Bell v. Ohio State Univ***., 351 F.3d 240, 250 (6th Cir. 2003) (internal quotation marks and citation omitted). The list of fundamental rights is short and "identifying a new fundamental right . . . is often an 'uphill battle.' " ***Does***, 507 F.3d at 964 (quoting ***Blau v. Fort Thomas Pub. Sch. Dist***., 401 F.3d 381, 393 (6th Cir. 2005)). To be considered fundamental, the right must be " 'deeply rooted in this Nation's history and tradition,' or 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were

sacrificed. . . .' " *Id.* (citation omitted) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977); *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

Plaintiff claims the City violated her substantive due process rights because the City "requir[ed] her to violate state law as a part of her police duties. The City required her to perform an[] illegal act." In her response to the City's motion for summary judgment, Plaintiff provides slightly more detail, stating the City "terminated [her] due to her failure to meet a quota for citations in violation of a Tennessee statute making same unlawful." Plaintiff, in the section of her complaint claiming a violation of her right to substantive due process, does not list precisely what Tennessee statute she was forced to violate. However, in a previous section, Plaintiff refers to Tenn. Code Ann. § 39-16-516, which provides the following:

> (a) A political subdivision or any agency of this state may not establish or maintain, formally or informally, a plan to evaluate, promote, compensate, or discipline a law enforcement officer solely by the issuance of a predetermined or specified number of any type or combination of types of traffic citations.
>
> (b) A political subdivision or any agency of this state may not require or suggest to a law enforcement officer that the law enforcement officer is required or expected to issue a predetermined or specified number of any type or combination of types of traffic citations within a specified period.
>
> (c) Nothing in this section shall prohibit a municipal corporation, a political subdivision or any agency of this state, from establishing performance standards for law enforcement officers that include issuance of traffic citations, but do not require issuance of a predetermined or specified number or any type or combination of

-10-

types of citations as the sole means of meeting
such performance standards.

Whether requiring an employee to perform an illegal act violates substantive due process is not a question the Court must answer here, because Plaintiff was not required to perform an illegal act. The only statute cited by Plaintiff, Tenn. Code Ann. § 39-16-516, is not a limitation on the individual actions of police officers. It is clearly a limitation only on "[a] political subdivision or any agency of [the] state." It specifically renders unlawful any evaluation of an officer based on the issuance of a predetermined amount of tickets, or any direct order to an officer to issue a specific number of tickets. It does not criminalize the act of compliance with that unlawful requirement or order. As an individual officer, Plaintiff could not have violated this statute. Rather, the facts alleged in her complaint suggest *the City* violated this statute. Because the law did not act as a limitation on Plaintiff's conduct, she was never "requir[ed] to violate state law." Plaintiff's sole alleged infringed "right" – not to be forced to violate the law – was never actually infringed, and therefore the Court must conclude her substantive due process claim fails.

Moreover, were the Court to take a broader view of Plaintiff's claim than is alleged in her complaint, and consider whether her arbitrary termination resulted in a violation of substantive due process, it would still conclude her claim fails. "Most, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by substantive due process." *Bracken v. Collica*, 94 F. App'x 265, 268 (6th Cir. 2004) (quoting *Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir. 1990)). The Sixth Circuit has concluded, "[a]bsent the infringement of some 'fundamental' right, it would appear that the termination of public employment does not constitute a denial of substantive due process." *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir. 1992). Therefore, regardless of whether Plaintiff's termination was irrational or "tinged by improper motive," as alleged for the first time in her response to the City's motion, her claim still fails because she has not alleged the violation of a "fundamental" right. *See*

-11-

> *Bracken*, 94 F. App'x at 269 ("Bracken's at-will employment hardly seems the sort of fundamental interest protected by substantive due process.").

(Emphasis in original; citations to federal record omitted.)

As can be seen, the federal district court addressed the issue of whether, in the words of plaintiff's complaint, "the actions of defendant violated her substantive due process rights pursuant to 42 U.S.C. § 1983 by requiring her to violate state law as a part of her police duties." Specifically, plaintiff alleged in federal court that defendant "required her to perform an[] illegal act." In contrast, the issue before the trial court and now before us is whether defendant either relied upon evidence that negates an essential element, or demonstrated that plaintiff's evidence is insufficient to establish an essential element, of her retaliatory discharge claim. As discussed further below, the crux of this issue in this case is whether, viewing all of the evidence in the light most favorable to plaintiff and resolving all factual inferences in her favor, defendant successfully demonstrated that she cannot establish that defendant terminated her employment solely for her refusal to participate in an illegal activity. Tenn. Code Ann. § 50-1-304(b); *Webb v. Nashville Area Habitat for Humanity*, 346 S.W.3d 422, 437 (Tenn. 2011). The issues before the federal court and trial court below are similar but not identical. The collateral estoppel doctrine does not preclude either the trial court or this Court from considering plaintiff's retaliatory discharge claim.

In its motion for summary judgment, defendant argued, alternatively and in addition to its collateral estoppel argument, that it was entitled to summary judgment because plaintiff was unable to establish an essential element of her claim. "The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result." *City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 60 n.18 (Tenn. Ct. App. 2004); *accord* *In re Estate of Trigg*, 368 S.W.3d 483, 502 n.63 (Tenn. 2012). Thus, we will proceed to address the correctness of the trial court's summary judgment under the Whistleblower Act and the case law interpreting it.

B.

In Tennessee, the general rule governing employment relationships that do not involve a contract for a definite term is the long-established employment-at-will doctrine. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534-35 (Tenn. 2002); *Sykes*, 343 S.W.3d at 26. This doctrine "recognizes the concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong." *Coleman*, 2014 WL 587010 at *17. "The employment-at-will doctrine is a bedrock of Tennessee common law." *Franklin v. Swift*

-12-

***Transp. Co.***, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006). The rule is not absolute, however; the General Assembly and the Supreme Court have recognized certain restrictions on the right of an employer to discharge an employee. In ***Chism v. Mid-South Milling Co.***, 762 S.W.2d 552 (Tenn. 1988), the High Court, discussing the tort of retaliatory discharge, stated the following:

> Both by statute and case law in this and other states some restrictions have been imposed upon the right of an employer to terminate an employee, usually for reasons of well-defined public policy. For example, . . . [t]here are restrictions upon employment or termination of persons for discriminatory reasons involving race, creed, color, sex, age, religion or national origin. See T.C.A. § 4-21-401(a).
>
> *        *        *
>
> It is obvious that the exception cannot be permitted to consume or eliminate the general rule. Corporate management, in cases such as this, must be allowed a great deal of discretion in the employing or discharging of corporate officers, where the latter are not employed for a definite term and have no formal contract of employment. ***Whittaker v. Care-More, Inc.***, 621 S.W.2d 395, 397 (Tenn. App. 1981). To be liable for retaliatory discharge in cases such as this, the employer must violate a clear public policy. Usually this policy will be evidenced by an unambiguous constitutional, statutory or regulatory provision.

762 S.W.2d at 555, 556.

As already stated, plaintiff is proceeding only on her claim that defendant violated the Whistleblower Act, Tenn. Code Ann. § 50-1-304. This retaliatory discharge statute provides in pertinent part as follows:

> (b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
>
> *        *        *
>
> (d)(1) Any employee terminated in violation of subsection (b)

-13-

shall have a cause of action against the employer for retaliatory
discharge and any other damages to which the employee may be
entitled.

"Illegal activities" is defined at Tenn. Code Ann. § 50-1-304(a)(3) as "activities that are in
violation of the criminal or civil code of this state or the United States or any regulation
intended to protect the public health, safety or welfare."

Tennessee courts have emphasized that the retaliatory discharge "exception to the
employment-at-will doctrine must be narrowly applied." *Stein v. Davidson Hotel Co.*, 945
S.W.2d 714, 717 n.3 (Tenn. 1997); *Chism*, 762 S.W.2d at 556; *Sykes*, 343 S.W.3d at 26
(describing the Whistleblower Act as a "narrowly crafted exception"); *Franklin*, 210 S.W.3d
at 530 ("the earliest Tennessee cases recognizing retaliatory discharge have emphasized that
it is an important, but narrow, exception to the employment-at-will doctrine").

The elements of a statutory retaliatory discharge action are as follows:

(1) the plaintiff was an employee of the defendant;

(2) the plaintiff refused to participate in or remain silent about
illegal activity;

(3) the defendant employer discharged or terminated the
plaintiff's employment; and

(4) the defendant terminated the plaintiff's employment solely
for the plaintiff's refusal to participate in or remain silent about
the illegal activity.

*Webb*, 346 S.W.3d at 437; *Sykes*, 343 S.W.3d at 27.

In this case, plaintiff did not allege that she was fired for refusing to remain silent
about an illegal activity. Her complaint alleges that her employment was terminated because
of her refusal to participate in an illegal activity; specifically, that her firing was "in
retaliation for [her] failure to write more traffic tickets in violation of T.C.A. § 39-16-516."
We hold that plaintiff's proof was insufficient to establish the second element as set forth in
*Webb*: that she refused to participate in an illegal activity. The retaliatory discharge statute
specifically defines an "illegal activity" as one that is "in violation of the criminal or civil
code . . . or any regulation intended to protect the public health, safety or welfare." The *only*

statute cited by plaintiff in her complaint or other filings is Tenn. Code Ann. § 39-16-516.[1] This statute, quoted above in the federal district court's memorandum opinion, applies only to "[a] political subdivision or any agency of this state." As the district court correctly observed,

"as an individual officer, Plaintiff could not have violated this statute. . . . Because the law did not act as a limitation on Plaintiff's conduct, she was never required to violate state law." (Brackets and internal quotation marks omitted.) Other than section 39-16-516, plaintiff identified no "violation of the criminal or civil code," or regulation, that she was asked or required to commit. Tenn. R. Civ. P. 8.05, as pertinent here, provides:

> Every pleading stating a claim or defense relying upon the violation of a statute shall, in a separate count or paragraph, either specifically refer to the statute or state all of the facts necessary to constitute such breach so that the other party can be duly apprised of the statutory violation charged. The substance of any ordinance or regulation relied upon for claim or defense shall be stated in a separate count or paragraph and the ordinance or regulation shall be clearly identified. The manner in which violation of any statute, ordinance or regulation is claimed shall be set forth.

Plaintiff's argument throughout this litigation has been that she refused to participate in the "illegal activity" of "writing unwarranted tickets." But plaintiff presented no evidence that either demonstrated, or led to a reasonable inference, that anyone employed by the City of Etowah ever suggested or required plaintiff to write an "unwarranted ticket." No one told her to issue a citation without probable cause, or for any improper reason. It is clear that Chief Armstrong looked at the number of citations each officer was issuing as one indicator of job performance. He plainly and directly warned plaintiff that in his view, she wasn't doing her job effectively because she wasn't writing enough tickets. Several Etowah police officers testified to the effect that, in the words of Officer Crawford, "we're told that they want either a citation or arrest a shift to show that we're actually working and doing something." Plaintiff testified that she was not given a set number of citations as a quota she

[1]In a somewhat convoluted sentence in her reply brief, Plaintiff argues, *for the first time*, that "[t]he illegal activity that [she] refused to participate in was not violating Tenn. Code Ann. § 39-16-516, which is a prohibition on a local law enforcement [sic] in terminating an employee for solely not meeting a traffic citation quota, but violating Tenn. Code Ann. § 40-7-103, which requires probable cause to arrest, and Tenn. Code Ann. § 40-7-118, which then allows a citation to be issued in lieu of continued arrest." Plaintiff has raised this argument and cited these statutes for the first time in her reply brief. This issue is waived for failure to raise it in the trial court. *Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996) ("Under Tennessee law, issues raised for the first time on appeal are waived.").

was required to meet, stating as follows:

> Q. Had you ever had any discussions prior to this [warning] e-mail with anyone from the city about the amount of tickets you were writing?
>
> A. I don't know if it was prior or not.  No.  We talked -- the guys and I talked and I'd asked Bill Crawford before, '"What's expected?  What's expected?  I don't really know what Eric wants us to do."  He said, "Just do your job."  And I said, "Well, that's what I'll do, I'll just do my job," which I did.
>
> Q. *But did anyone ever tell you you are to write X amount of tickets?*
>
> A. Several times I was told, you know, "You need to pick up ticket writing. We need more tickets."  *But as far as putting a number on it, no.*
>
> Q. Okay.
>
> A. I think when it comes down to this saying you need one violator in a 12-hour shift was more or less -- one day you would go in and you'd write tickets, the next day you go in and you don't write tickets.
>
> Q. Okay. Are you referring to the second sentence here, and I'll give it back to you, it says: "Now I'm not saying you have a quota, but we both know that you will see at least one violator in a 12-hour shift."  Is that what you're referring to?
>
> A. Uh-huh.  And I did.
>
> Q. You did see more than one violator?
>
> A. I would see a violator, but that did not mean a ticket all the time.

(Emphasis added.)  Chief Armstrong testified on this point as follows:

-16-

Q: And at that time, in your opinion as chief of police, how many traffic stops should she [plaintiff] have been making?

A: I didn't have a set number, but, you know, should show some kind of work.

Q: Well, what would have been --

A: It's a town of 3,500 people. Lots of traffic goes through.

Q: What would have been an acceptable range, then, for stops?

A: An acceptable range is seeing violators and stopping them, doing what you're sworn to do.

Q: What I'm asking you --

A: Yeah, you want me to give you a number. I don't have that. What I'm saying is, if you see a violator, you should stop them. You should do your job as a police officer.

Q: What I'm asking is, I'm asking for how you gauge that. How do you gauge that an officer's performance is substantive without a quantity?

A: If you go a month and you work 15 days, 14 to 15 days in that month, which have 12-hour shifts, and you write one or two or three tickets in that entire month, which means traffic stops and warnings, whatever, would you call that acceptable?

Q You're saying that just as a general description if an officer performs to that benchmark, that's something that, in your mind as the chief, would have been reasonable?

A: Four? Is that what you're asking me?

Q: You said just a minute ago, go one month, 15 or 14 workdays in one month, two or three traffic tickets, you said –

A: I'm saying that's what [plaintiff] was doing. Was it

acceptable?  Not really.

Q  What I'm asking is, I guess, is I'm asking -- let me ask this:
Is there a specific benchmark she would have achieved that
would have been acceptable?

A: It's acceptable if she would have stopped violators that were
in town.  If you go a whole shift and you don't have any traffic
stops, that's not acceptable.  That's 12 hours. Any experienced
police officer would definitely see some type of crime occurring
in a town of 3,500 people.

Tenn. Code Ann. § 39-16-516(c) provides as follows:

Nothing in this section shall prohibit a municipal corporation, a
political subdivision or any agency of this state, from
establishing performance standards for law enforcement officers
that include issuance of traffic citations, but do not require
issuance of a predetermined or specified number or any type or
combination of types of citations as the sole means of meeting
such performance standards.

This statute authorizes the kind of performance evaluation standards utilized by Chief
Armstrong and the City.  We hold that summary judgment was properly granted because
plaintiff failed to establish a genuine issue of material fact on the issue of whether she
refused to participate in an illegal activity.

Additionally, we find that the undisputed proof shows that plaintiff cannot establish
the fourth element of a statutory retaliatory discharge – that "the defendant terminated the
plaintiff's employment *solely* for the plaintiff's refusal to participate in or remain silent about
the illegal activity." *Webb*, 346 S.W.3d at 437 (emphasis added).  The Supreme Court stated
in *Sykes* that to demonstrate a violation of the Whistleblower Act, a plaintiff must prove "the
essential element of an *exclusive causal relationship* between the plaintiff['s] whistleblowing
activity and [his or her] discharge."  343 S.W.3d at 21, quoting *Guy*, 79 S.W.3d at 535
(emphasis added).  In *Sykes*, the Court addressed the claims of two law enforcement officers
that they had been wrongfully discharged, and provided the following pertinent analysis:

The [defendant] CHA challenges the ability of Mr. Sykes and
Mr. Greene to establish the "sole causation" element of their
claims.  At trial, [plaintiffs] must show that the CHA terminated

-18-

their employment solely for their refusal to participate in or remain silent about the alleged illegal activity. We have carefully reviewed the evidence in the record as outlined above in the light most favorable to the nonmovants, Mr. Sykes and Mr. Greene, and we conclude that the CHA has produced and/or identified evidence that neither Mr. Sykes nor Mr. Greene can establish the essential element of *sole* causation. The *undisputed* evidence in the record establishes valid and legitimate reasons for the CHA to have terminated both Mr. Sykes' and Mr. Greene's employment. Thus, the CHA has successfully shifted the burden to [plaintiffs] to demonstrate a genuine issue of material fact regarding whether the decision to terminate their employment was solely due to their protected whistleblowing activity. Neither Mr. Sykes nor Mr. Greene has produced or identified sufficient evidence to show an issue of material fact on this challenging element of sole causation.

\* \* \*

By requiring a plaintiff employee to show that he or she was "discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities," the legislature has chosen to enact a stringent standard and set the bar high for recovery under a retaliatory discharge claim pursuant to the Whistleblower Act. In summary, even viewing all the proof in the light most favorable to [plaintiffs], a reasonable juror could not conclude that the sole reason for [their] termination . . . was their refusal to participate in or remain silent about the alleged illegal activities in this case.

343 S.W.3d at 27, 28 (emphasis in original).

Similar to **Sykes**, the undisputed proof here establishes valid and legitimate reasons for plaintiff's termination – her "poor attitude and demeanor" at work for one thing, and the fact that she was not writing many tickets which was interpreted by her supervisor as not doing her job, as another.

City Manager Matthew Gravley testified as follows:

I had witnessed on several occasions and also talked with the

-19-

chief and other officers about Ms. Bige and her apparent, you know, issues or whatever was causing her to be, you know, unhappy and just to have a poor attitude at work, because I wanted her to perform well and have a good impact on the community. So it was an issue that we talked about.

\* \* \*

Q: Okay. Now, you said she was unhappy, poor attitude. Did that have an impact on her job performance?

A: It had an impact on the entire police department.

Q: Tell me how.

A: Well, because as any, as any manager knows, one person can bring down the morale of an entire department. And if that attitude was fairly prevalent and -- like I say, it was enough issue to cause concern that I knew about it and that I wanted to, you know, to see that it got changed.

Q: How did you know she had a poor attitude or that she was unhappy?

A: Because, as I said before, I witnessed it.

Q: Tell me what you witnessed.

A: I witnessed her being sullen, noncommunicative, uncooperative.

Chief Armstrong testified that plaintiff's demeanor and attitude was "negative about the department, negative about the leaders of the department, negative about the leaders of the city and negative about everything in general."

The following statements from defendant's Rule 56.03 statement of undisputed material facts were *not disputed* by plaintiff:

The Plaintiff testified in her deposition that during the early portions of 2011, events in her personal life had an impact on

-20-

her demeanor in the workplace.

She was at that time fighting with her boyfriend, and her son was arrested in Bradley County for promotion of methamphetamine.

Bige testified in her deposition that she was depressed "[i]n the middle of all the changes at work" and that her personal issues "had an impact on [her] demeanor[.]" Bige was sure everyone noticed the changes, and stated "I have my feelings on my sleeve."

[Officer] Crawford testified that he and Bige "didn't communicate a whole lot," and he felt "that she was unhappy here. She didn't like the night shift." Crawford knew she was unhappy: "From when I had worked with her the first time, she was unhappy. . . I think she – I can't say she told me that, but you can tell when somebody is unhappy."

Based on the undisputed proof, the defendant in this case demonstrated that plaintiff was unable to prove the essential element of sole causation.

V.

The trial court's summary judgment is affirmed. Costs on appeal are assessed to the appellant, Phyllis Louise Bige. The case is remanded to the trial court for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE

-21-